# GEORGIA *v.* ASHCROFT, ATTORNEY GENERAL, ET AL.

No. 02–182.   Argued April 29, 2003—Decided June 26, 2003

462

464

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and SCALIA, KENNEDY, and THOMAS, JJ., joined. KENNEDY, J., *post*, p. 491, and THOMAS, J., *post*, p. 492, filed concurring opinions. SOUTER, J., filed a dissenting opinion, in which STEVENS, GINSBURG, and BREYER, JJ., joined, *post*, p. 492.

*David F. Walbert* argued the cause for appellant. With him on the briefs were *Thurbert E. Baker*, Attorney General of Georgia, *Dennis R. Dunn*, Deputy Attorney General, and *Mark H. Cohen*.

*Malcolm L. Stewart* argued the cause for the federal appellees. With him on the brief were *Solicitor General Olson, Assistant Attorney General Boyd, Deputy Solicitor General Clement*, and *Mark L. Gross*.

*E. Marshall Braden* argued the cause for appellee intervenors. With him on the brief were *Amy M. Henson, Frank B. Strickland*, and *Anne W. Lewis*.*

JUSTICE O'CONNOR delivered the opinion of the Court.

In this case, we decide whether Georgia's State Senate redistricting plan should have been precleared under § 5 of the Voting Rights Act of 1965, 79 Stat. 439, as renumbered and amended, 42 U. S. C. § 1973c. Section 5 requires that before a covered jurisdiction's new voting "standard, prac-

---

*A brief of *amicus curiae* urging affirmance was filed for the Georgia Coalition for the Peoples' Agenda by *Laughlin McDonald, Neil Bradley, Barbara R. Arnwine, Thomas J. Henderson, Anita Hodgkiss, Elaine R. Jones, Norman J. Chachkin*, and *Todd A. Cox*.

tice, or procedure" goes into effect, it must be precleared by either the Attorney General of the United States or a federal court to ensure that the change "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U. S. C. §1973c. Whether a voting procedure change should be precleared depends on whether the change "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States*, 425 U. S. 130, 141 (1976). We therefore must decide whether Georgia's State Senate redistricting plan is retrogressive as compared to its previous, benchmark districting plan.

I

A

Over the past decade, the propriety of Georgia's state and congressional districts has been the subject of repeated litigation. In 1991, the Georgia General Assembly began the process of redistricting after the 1990 census. Because Georgia is a covered jurisdiction under §5 of the Voting Rights Act, see *Miller* v. *Johnson*, 515 U. S. 900, 905 (1995), Georgia submitted its revised State Senate plan to the United States Department of Justice for preclearance. The plan as enacted into law increased the number of majority-minority districts from the previous Senate plan. The Department of Justice nevertheless refused preclearance because of Georgia's failure to maximize the number of majority-minority districts. See *Johnson* v. *Miller*, 929 F. Supp. 1529, 1537, and n. 23 (SD Ga. 1996). After Georgia made changes to the Senate plan in an attempt to satisfy the United States' objections, the State again submitted it to the Department of Justice for preclearance. Again, the Department of Justice refused preclearance because the plan did not contain a sufficient number of majority-minority districts. See *id.*, at 1537, 1539. Finally, the United States precleared

Georgia's third redistricting plan, approving it in the spring of 1992. See *id.*, at 1537.

Georgia's 1992 Senate plan was not challenged in court. See *id.*, at 1533–1534. Its congressional districting plan, however, was challenged as unconstitutional under the Equal Protection Clause of the Fourteenth Amendment. See *Shaw* v. *Reno,* 509 U. S. 630 (1993). In 1995, we held in *Miller* v. *Johnson* that Georgia's congressional districting plan was unconstitutional because it engaged in "the very racial stereotyping the Fourteenth Amendment forbids" by making race the "predominant, overriding factor explaining" Georgia's congressional districting decisions. 515 U. S., at 928, 920. And even though it was "safe to say that the congressional plan enacted in the end was required in order to obtain preclearance," this justification did not permit Georgia to engage in racial gerrymandering. See *id.*, at 921. Georgia's State Senate districts served as "building blocks" to create the congressional districting plan found unconstitutional in *Miller* v. *Johnson.* *Johnson* v. *Miller,* 929 F. Supp., at 1533, n. 8 (internal quotation marks omitted); see also *id.*, at 1536.

Georgia recognized that after *Miller* v. *Johnson,* its legislative districts were unconstitutional under the Equal Protection Clause. See 929 F. Supp., at 1533, 1540. Accordingly, Georgia attempted to cure the perceived constitutional problems with the 1992 State Senate districting plan by passing another plan in 1995. The Department of Justice refused to preclear the 1995 plan, maintaining that it retrogressed from the 1992 plan and that *Miller* v. *Johnson* concerned only Georgia's congressional districts, not Georgia's State Senate districts. See 929 F. Supp., at 1540–1541.

Private litigants subsequently brought an action challenging the constitutionality of the 1995 Senate plan. See *id.*, at 1533. The three-judge panel of the District Court reviewing the 1995 Senate plan found that "[i]t is clear that a black maximization policy had become an integral part of the sec-

tion 5 preclearance process . . . when the Georgia redistricting plans were under review. The net effect of the DOJ's preclearance objection[s] . . . was to require the State of Georgia to increase the number of majority black districts in its redistricting plans, which were already ameliorative plans, beyond any reasonable concept of non-retrogression." *Id.*, at 1539–1540. The court noted that in *Miller* v. *Johnson*, we specifically disapproved of the Department of Justice's policy that the maximization of black districts was a part of the § 5 retrogression analysis. See 929 F. Supp., at 1539. Indeed, in *Miller*, we found that the Department of Justice's objections to Georgia's redistricting plans were "driven by its policy of maximizing majority-black districts." 515 U. S., at 924. And "[i]n utilizing § 5 to require States to create majority-minority districts wherever possible, the Department of Justice expanded its authority under the statute beyond what Congress intended and we have upheld." *Id.*, at 925.

The District Court stated that the maximization of majority-minority districts in Georgia "artificially push[ed] the percentage of black voters within some majority black districts as high as possible." 929 F. Supp., at 1536. The plan that eventually received the Department of Justice's preclearance in 1992 "represented the General Assembly's surrender to the black maximization policy of the DOJ." *Id.*, at 1540. The court then found that the 1995 plan was an unconstitutional racial gerrymander. See *id.*, at 1543.

Under court direction, Georgia and the Department of Justice reached a mediated agreement on the constitutionality of the 1995 Senate plan. Georgia passed a new plan in 1997, and the Department of Justice quickly precleared it. The redrawn map resembled to a large degree the 1992 plan that eventually received preclearance from the Department of Justice, with some changes to accommodate the decision of this Court in *Miller* v. *Johnson,* and of the District Court in *Johnson* v. *Miller.*

All parties here concede that the 1997 plan is the benchmark plan for this litigation because it was in effect at the time of the 2001 redistricting effort. The 1997 plan drew 56 districts, 11 of them with a total black population of over 50%, and 10 of them with a black voting age population of over 50%. See Record, Doc. No. 148, Pl. Exh. 1C (hereinafter Pl. Exh.). The 2000 census revealed that these numbers had increased so that 13 districts had a black population of at least 50%, with the black voting age population exceeding 50% in 12 of those districts. See 195 F. Supp. 2d 25, 39 (DC 2002).

After the 2000 census, the Georgia General Assembly began the process of redistricting the Senate once again. No party contests that a substantial majority of black voters in Georgia vote Democratic, or that all elected black representatives in the General Assembly are Democrats. The goal of the Democratic leadership—black and white—was to maintain the number of majority-minority districts and also increase the number of Democratic Senate seats. See *id.*, at 41–42. For example, the Director of Georgia's Legislative Redistricting Office, Linda Meggers, testified that the Senate Black Caucus " 'wanted to maintain' " the existing majority-minority districts and at the same time " 'not waste' " votes. *Id.*, at 41.

The Vice Chairman of the Senate Reapportionment Committee, Senator Robert Brown, also testified about the goals of the redistricting effort. Senator Brown, who is black, chaired the subcommittee that developed the Senate plan at issue here. See *id.*, at 42. Senator Brown believed when he designed the Senate plan that as the black voting age population in a district increased beyond what was necessary, it would "pus[h] the whole thing more towards [the] Republican[s]." Pl. Exh. 20, at 24. And "correspondingly," Senator Brown stated, "the more you diminish the power of African-Americans overall." *Ibid.* Senator Charles Walker was the majority leader of the Senate. Senator Walker

testified that it was important to attempt to maintain a Democratic majority in the Senate because "we [African-Americans] have a better chance to participate in the political process under the Democratic majority than we would have under a Republican majority." Pl. Exh. 24, at 19. At least 7 of the 11 black members of the Senate could chair committees. See 195 F. Supp. 2d, at 41.

The plan as designed by Senator Brown's committee kept true to the dual goals of maintaining at least as many majority-minority districts while also attempting to increase Democratic strength in the Senate. Part of the Democrats' strategy was not only to maintain the number of majority-minority districts, but to increase the number of so-called "influence" districts, where black voters would be able to exert a significant—if not decisive—force in the election process. As the majority leader testified, "in the past, you know, what we would end up doing was packing. You put all blacks in one district and all whites in one district, so what you end up with is [a] black Democratic district and [a] white Republican district. That's not a good strategy. That does not bring the people together, it divides the population. But if you put people together on voting precincts it brings people together." Pl. Exh. 24, at 19.

The plan as designed by the Senate "unpacked" the most heavily concentrated majority-minority districts in the benchmark plan, and created a number of new influence districts. The new plan drew 13 districts with a majority-black voting age population, 13 additional districts with a black voting age population of between 30% and 50%, and 4 other districts with a black voting age population of between 25% and 30%. See Pl. Exh. 2C. According to the 2000 census, as compared to the benchmark plan, the new plan reduced by five the number of districts with a black voting age population in excess of 60%. Compare Pl. Exh. 1D with Pl. Exh. 2C. Yet it increased the number of majority-black voting age population districts by one, and it increased the number

of districts with a black voting age population of between 25% and 50% by four. As compared to the benchmark plan enacted in 1997, the difference is even larger. Under the old census figures, Georgia had 10 Senate districts with a majority-black voting age population, and 8 Senate districts with a black voting age population of between 30% and 50%. See Pl. Exh. 1C. The new plan thus increased the number of districts with a majority black voting age population by three, and increased the number of districts with a black voting age population of between 30% and 50% by another five. Compare Pl. Exh. 1C with Pl. Exh. 2C.

The Senate adopted its new districting plan on August 10, 2001, by a vote of 29 to 26. Ten of the eleven black Senators voted for the plan. 195 F. Supp. 2d, at 55. The Georgia House of Representatives passed the Senate plan by a vote of 101 to 71. Thirty-three of the thirty-four black Representatives voted for the plan. *Ibid.* No Republican in either the House or the Senate voted for the plan, making the votes of the black legislators necessary for passage. See *id.,* at 41. The Governor signed the Senate plan into law on August 24, 2001, and Georgia subsequently sought to obtain preclearance.

### B

Pursuant to § 5 of the Voting Rights Act, a covered jurisdiction like Georgia has the option of either seeking administrative preclearance through the Attorney General of the United States or seeking judicial preclearance by instituting an action in the United States District Court for the District of Columbia for a declaratory judgment that the voting change comports with § 5. 42 U. S. C. § 1973c; *Georgia* v. *United States,* 411 U. S. 526 (1973). Georgia chose the latter method, filing suit seeking a declaratory judgment that the State Senate plan does not violate § 5.

Georgia, which bears the burden of proof in this action, see *Pleasant Grove* v. *United States,* 479 U. S. 462 (1987), attempted to prove that its Senate plan was not retrogres-

sive either in intent or in effect. It submitted detailed evidence documenting in each district the total population, the total black population, the black voting age population, the percentage of black registered voters, and the overall percentage of Democratic votes (i. e., the overall likelihood that voters in a particular district will vote Democratic), among other things. See 195 F. Supp. 2d, at 36; see also Pl. Exhs. 2C, 2D. The State also submitted evidence about how each of these statistics compared to the benchmark districts. See 195 F. Supp. 2d, at 36; see also Pl. Exhs. 1C, 1D, 1E (revised).

Georgia also submitted testimony from numerous people who had participated in enacting the Senate plan into law, and from United States Congressman John Lewis, who represents the Atlanta area. These witnesses testified that the new Senate plan was designed to increase black voting strength throughout the State as well as to help ensure a continued Democratic majority in the Senate. The State also submitted expert testimony that African-American and non-African-American voters have equal chances of electing their preferred candidate when the black voting age population of a district is at 44.3%. Finally, in response to objections raised by the United States, Georgia submitted more detailed statistical evidence with respect to three proposed Senate districts that the United States found objectionable—Districts 2, 12, and 26—and two districts that the intervenors challenged—Districts 15 and 22.

The United States, through the Attorney General, argued in District Court that Georgia's 2001 Senate redistricting plan should not be precleared. It argued that the plan's changes to the boundaries of Districts 2, 12, and 26 unlawfully reduced the ability of black voters to elect candidates of their choice. See Brief for Federal Appellees 8; 195 F. Supp. 2d, at 72. The United States noted that in District 2, the black voting age population dropped from 60.58% to 50.31%; in District 12, the black voting age population dropped from 55.43% to 50.66%; and in District 26, the black

voting age population dropped from 62.45% to 50.80%.[1]
Moreover, in all three of these districts, the percentage of
black registered voters dropped to just under 50%. The
United States also submitted expert evidence that voting is
racially polarized in Senate Districts 2, 12, and 26. See *id.*,
at 69–71. The United States acknowledged that some lim-
ited percentage of whites would vote for a black candidate,
but maintained that the percentage was not sufficient for
black voters to elect their candidate of choice. See *id.*, at
70–71. The United States also offered testimony from vari-
ous witnesses, including lay witnesses living in the three dis-
tricts, who asserted that the new contours of Districts 2, 12,
and 26 would reduce the opportunity for blacks to elect a
candidate of their choice in those districts; Senator Regina
Thomas of District 2, the only black Senator who voted
against the plan; Senator Eric Johnson, the Republican
leader of the Senate; and some black legislators who voted

---

[1] Georgia and the United States have submitted slightly different figures
regarding the black voting age population of each district. The differing
figures depend upon whether the total number of blacks includes those
people who self-identify as both black and a member of another minority
group, such as Hispanic. Georgia counts this group of people, while the
United States does not do so. Like the District Court, we consider all the
record information, "including total black population, black registration
numbers and both [black voting age population] numbers." 195 F. Supp.
2d 25, 79 (DC 2002). We focus in particular on Georgia's black voting age
population numbers in this case because all parties rely on them to some
extent and because Georgia used its own black voting age population num-
bers when it enacted the Senate plan. Moreover, the United States does
not count all persons who identify themselves as black. It counts those
who say they are black and those who say that they are both black and
white, but it does not count those who say they are both black and a
member of another minority group. Using the United States' numbers
may have more relevance if the case involves a comparison of different
minority groups. Cf. *Johnson* v. *De Grandy*, 512 U. S. 997 (1994); *Bush* v.
*Vera*, 517 U. S. 952 (1996). Here, however, the case involves an examina-
tion of only one minority group's effective exercise of the electoral fran-
chise. In such circumstances, we believe it is proper to look at *all* individ-
uals who identify themselves as black.

for the plan but questioned how the plan would affect black voters. See Vols. 25–27 Record, Doc. No. 177, United States Exhs. 707–736 (Depositions). As the District Court stated, "the United States' evidence was extremely limited in scope—focusing only on three contested districts in the State Senate plan. That evidence was not designed to permit the court to assess the overall impact of [the Senate plan]." 195 F. Supp. 2d, at 37.

Pursuant to Federal Rule of Civil Procedure 24, the District Court also permitted four African-American citizens of Georgia to intervene. The intervenors identified two other districts—Districts 15 and 22—where they alleged retrogression had occurred. The intervenors "present[ed] little evidence other than proposed alternative plans and an expert report critiquing the State's expert report." 195 F. Supp. 2d, at 37.

A three-judge panel of the District Court held that Georgia's State Senate apportionment violated § 5, and was therefore not entitled to preclearance. See *id.,* at 97. Judge Sullivan, joined by Judge Edwards, concluded that Georgia had "not demonstrated by a preponderance of the evidence that the State Senate redistricting plan would not have a retrogressive effect on African American voters" effective exercise of the electoral franchise. *Ibid.* The court found that Senate Districts 2, 12, and 26 were retrogressive because in each district, a lesser opportunity existed for the black candidate of choice to win election under the new plan than under the benchmark plan. See *id.,* at 93–94. The court found that the reductions in black voting age population in Districts 2, 12, and 26 would "diminish African American voting strength in these districts," and that Georgia had "failed to present any . . . evidence" that the retrogression in those districts "will be offset by gains in other districts." *Id.,* at 88.

Judge Edwards, joined by Judge Sullivan, concurred. Judge Edwards emphasized that §§ 5 and 2 are "procedurally and substantively distinct provisions." *Id.*, at 97. He therefore rejected Georgia's argument that a plan preserving an equal opportunity for minorities to elect candidates of their choice satisfies § 5. Judge Edwards also rejected the testimony of the black Georgia politicians who supported the Senate plan. In his view, the testimony did not address whether racial polarization was occurring in Senate Districts 2, 12, and 26. See *id.*, at 101–102.

Judge Oberdorfer dissented. He would have given "greater credence to the political expertise and motivation of Georgia's African-American political leaders and reasonable inferences drawn from their testimony and the voting data and statistics." *Id.*, at 102. He noted that this Court has not answered "whether a redistricting plan that preserves or increases the number of districts statewide in which minorities have a fair or reasonable opportunity to elect candidates of choice is entitled to preclearance, or whether every district must remain at or improve on the benchmark probability of victory, even if doing so maintains a minority supermajority far in excess of the level needed for effective exercise of [the] electoral franchise." *Id.*, at 117.

After the District Court refused to preclear the plan, Georgia enacted another plan, largely similar to the one at issue here, except that it added black voters to Districts 2, 12, and 26. The District Court precleared this plan. See 204 F. Supp. 2d 4 (2002). No party has contested the propriety of the District Court's preclearance of the Senate plan as amended. Georgia asserts that it will use the plan as originally enacted if it receives preclearance.

We noted probable jurisdiction to consider whether the District Court should have precleared the plan as originally enacted by Georgia in 2001, 537 U. S. 1151 (2003), and now vacate the judgment below.

## II

Before addressing the merits of Georgia's preclearance claim, we address the State's argument that the District Court was incorrect in allowing the private litigants to intervene in this lawsuit. Georgia maintains that private parties should not be allowed to intervene in §5 actions because States should not be subjected to the political stratagems of intervenors. While the United States disagrees with Georgia on the propriety of intervention here, the United States argues that this question is moot because the participation of the intervenors did not affect the District Court's ruling on the merits and the intervenors did not appeal the court's ruling.

We do not think Georgia's argument is moot. The intervenors did not have to appeal because they were prevailing parties below. Moreover, the District Court addressed the evidence that the intervenors submitted, which is now in front of this Court. The issue whether intervenors are proper parties still has relevance in this Court because they argue here that the District Court correctly found that the Senate plan was retrogressive.

The District Court properly found that Federal Rule of Civil Procedure 24 governs intervention in this case. Section 5 permits a State to bring "an action in the United States District Court for the District of Columbia for a declaratory judgment." 42 U. S. C. §1973c. Section 5 does not limit in any way the application of the Federal Rules of Civil Procedure to this type of lawsuit, and the statute by its terms does not bar private parties from intervening. In *NAACP* v. *New York,* 413 U. S. 345, 365 (1973), we held that in an action under §5, "[i]ntervention in a federal court suit is governed by Fed. Rule Civ. Proc. 24."

To support its argument, Georgia relies on *Morris* v. *Gressette,* 432 U. S. 491 (1977). In *Morris,* we held that in an *administrative* preclearance action, the decision to object belongs only to the Attorney General and is not judicially

reviewable. See *id.*, at 504–505. But *Morris* concerned the administrative preclearance process, not the judicial preclearance process. *Morris* itself recognized the difference between administrative preclearance and judicial preclearance. See *id.*, at 503–507.

Here, the District Court granted the motion to intervene because it found that the intervenors' "analysis of the . . . Senate redistricting pla[n] identifies interests that are not adequately represented by the existing parties." App. to Juris. Statement 218a. Private parties may intervene in §5 actions assuming they meet the requirements of Rule 24, and the District Court did not abuse its discretion in granting the motion to intervene in this case. See *NAACP* v. *New York, supra,* at 367.

## III

### A

Section 5 of the Voting Rights Act "has a limited substantive goal: "'to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise.'" *Miller,* 515 U. S., at 926 (quoting *Beer* v. *United States,* 425 U. S., [at 141])." *Bush* v. *Vera,* 517 U. S. 952, 982–983 (1996). Thus, a plan that merely preserves "current minority voting strength" is entitled to §5 preclearance. *City of Lockhart* v. *United States,* 460 U. S. 125, 134, n. 10 (1983); *Bush* v. *Vera, supra,* at 983. Indeed, a voting change with a discriminatory but nonretrogressive purpose or effect does not violate §5. See *Reno* v. *Bossier Parish School Bd.,* 528 U. S. 320, 341 (2000). And *"no matter how unconstitutional it may be,"* a plan that is not retrogressive should be precleared under §5. *Id.,* at 336. "[P]reclearance under §5 affirms nothing but the absence of backsliding." *Id.,* at 335.

Georgia argues that a plan should be precleared under §5 if the plan would satisfy §2 of the Voting Rights Act of 1965,

42 U. S. C. § 1973. We have, however, "consistently understood" § 2 to "combat different evils and, accordingly, to impose very different duties upon the States." *Reno* v. *Bossier Parish School Bd.*, 520 U. S. 471, 477 (1997) *(Bossier Parish I).* For example, while § 5 is limited to particular covered jurisdictions, § 2 applies to all States. And the § 2 inquiry differs in significant respects from a § 5 inquiry. In contrast to § 5's retrogression standard, the "essence" of a § 2 vote dilution claim is that "a certain electoral law, practice, or structure . . . cause[s] an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg* v. *Gingles,* 478 U. S. 30, 47 (1986); see also *id.,* at 48–50 (enunciating a three-part test to establish vote dilution); *id.,* at 85–100 (O'CONNOR, J., concurring in judgment); 42 U. S. C. § 1973(b). Unlike an inquiry under § 2, a retrogression inquiry under § 5, "by definition, requires a comparison of a jurisdiction's new voting plan with its existing plan." *Bossier Parish I, supra,* at 478. While some parts of the § 2 analysis may overlap with the § 5 inquiry, the two sections "differ in structure, purpose, and application." *Holder* v. *Hall,* 512 U. S. 874, 883 (1994) (plurality opinion).

In *Bossier Parish I,* we specifically held that a violation of § 2 is not an independent reason to deny preclearance under § 5. See 520 U. S., at 477. The reason for this holding was straightforward: "[R]ecognizing § 2 violations as a basis for denying § 5 preclearance would inevitably make compliance with § 5 contingent upon compliance with § 2. Doing so would, for all intents and purposes, replace the standards for § 5 with those for § 2." *Ibid.*

Georgia here makes the flip side of the argument that failed in *Bossier Parish I*—compliance with § 2 suffices for preclearance under § 5. Yet the argument fails here for the same reasons the argument failed in *Bossier Parish I.* We refuse to equate a § 2 vote dilution inquiry with the § 5 retrogression standard. Georgia's argument, like the argument

in *Bossier Parish I*, would "shift the focus of § 5 from nonretrogression to vote dilution, and [would] change the § 5 benchmark from a jurisdiction's existing plan to a hypothetical, undiluted plan." *Id.*, at 480. Instead of showing that the Senate plan is nondilutive under § 2, Georgia must prove that its plan is nonretrogressive under § 5.

## B

Georgia argues that even if compliance with § 2 does not automatically result in preclearance under § 5, its State Senate plan should be precleared because it does not lead to "a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States, supra*, at 141. See, *e. g.*, Brief for Appellant 32, 36.

While we have never determined the meaning of "effective exercise of the electoral franchise," this case requires us to do so in some detail. First, the United States and the District Court correctly acknowledge that in examining whether the new plan is retrogressive, the inquiry must encompass the entire statewide plan as a whole. See 195 F. Supp. 2d, at 73; Tr. of Oral Arg. 28–29. Thus, while the diminution of a minority group's effective exercise of the electoral franchise in one or two districts may be sufficient to show a violation of § 5, it is only sufficient if the covered jurisdiction cannot show that the gains in the plan as a whole offset the loss in a particular district.

Second, any assessment of the retrogression of a minority group's effective exercise of the electoral franchise depends on an examination of all the relevant circumstances, such as the ability of minority voters to elect their candidate of choice, the extent of the minority group's opportunity to participate in the political process, and the feasibility of creating a nonretrogressive plan. See, *e. g.*, *Johnson* v. *De Grandy*, 512 U. S. 997, 1011–1012, 1020–1021 (1994); *Richmond* v. *United States*, 422 U. S. 358, 371–372 (1975); *Thornburg*

v. *Gingles, supra,* at 97–100 (O'CONNOR, J., concurring in judgment). "No single statistic provides courts with a shortcut to determine whether" a voting change retrogresses from the benchmark. *Johnson* v. *De Grandy, supra,* at 1020–1021.

In assessing the totality of the circumstances, a court should not focus solely on the comparative ability of a minority group to elect a candidate of its choice. While this factor is an important one in the § 5 retrogression inquiry, it cannot be dispositive or exclusive. The standard in § 5 is simple—whether the new plan "would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States,* 425 U. S., at 141.

The ability of minority voters to elect a candidate of their choice is important but often complex in practice to determine. In order to maximize the electoral success of a minority group, a State may choose to create a certain number of "safe" districts, in which it is highly likely that minority voters will be able to elect the candidate of their choice. See *Thornburg* v. *Gingles,* 478 U. S., at 48–49; *id.,* at 87–89 (O'CONNOR, J., concurring in judgment). Alternatively, a State may choose to create a greater number of districts in which it is likely—although perhaps not quite as likely as under the benchmark plan—that minority voters will be able to elect candidates of their choice. See *id.,* at 88–89 (O'CON-NOR, J., concurring in judgment); cf. Pildes, Is Voting-Rights Law Now at War With Itself? Social Science and Voting Rights in the 2000s, 80 N. C. L. Rev. 1517 (2002).

Section 5 does not dictate that a State must pick one of these methods of redistricting over another. Either option "will present the minority group with its own array of electoral risks and benefits," and presents "hard choices about what would truly 'maximize' minority electoral success." *Thornburg* v. *Gingles, supra,* at 89 (O'CONNOR, J., concurring in judgment). On one hand, a smaller number of safe

majority-minority districts may virtually guarantee the election of a minority group's preferred candidate in those districts. Yet even if this concentration of minority voters in a few districts does not constitute the unlawful packing of minority voters, see *Voinovich* v. *Quilter*, 507 U. S. 146, 153–154 (1993), such a plan risks isolating minority voters from the rest of the State, and risks narrowing political influence to only a fraction of political districts. Cf. *Shaw* v. *Reno*, 509 U. S., at 648–650. And while such districts may result in more "descriptive representation" because the representatives of choice are more likely to mirror the race of the majority of voters in that district, the representation may be limited to fewer areas. See H. Pitkin, The Concept of Representation 60–91 (1967).

On the other hand, spreading out minority voters over a greater number of districts creates more districts in which minority voters may have the opportunity to elect a candidate of their choice. Such a strategy has the potential to increase "substantive representation" in more districts, by creating coalitions of voters who together will help to achieve the electoral aspirations of the minority group. See *id.*, at 114. It also, however, creates the risk that the minority group's preferred candidate may lose. Yet as we stated in *Johnson* v. *De Grandy, supra,* at 1020:

> "[T]here are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice. Those candidates may not represent perfection to every minority voter, but minority voters are not immune from the obligation to pull, haul, and trade to find common political ground, the virtue of which is not to be slighted in applying a statute meant to hasten the waning of racism in American politics."

Section 5 gives States the flexibility to choose one theory of effective representation over the other.

In addition to the comparative ability of a minority group to elect a candidate of its choice, the other highly relevant factor in a retrogression inquiry is the extent to which a new plan changes the minority group's opportunity to participate in the political process. "'[T]he power to influence the political process is not limited to winning elections.'" *Thornburg* v. *Gingles, supra,* at 99 (O'CONNOR, J., concurring in judgment) (quoting *Davis* v. *Bandemer,* 478 U. S. 109, 132 (1986)); see also *White* v. *Regester,* 412 U. S. 755, 766–767 (1973); *Whitcomb* v. *Chavis,* 403 U. S. 124, 149–160 (1971); *Johnson* v. *De Grandy,* 512 U. S., at 1011–1012.

Thus, a court must examine whether a new plan adds or subtracts "influence districts"—where minority voters may not be able to elect a candidate of choice but can play a substantial, if not decisive, role in the electoral process. Cf. *Shaw* v. *Hunt,* 517 U. S. 899, 947, n. 21 (1996) (STEVENS, J., dissenting); *Hays* v. *Louisiana,* 936 F. Supp. 360, 364, n. 17 (WD La. 1996); *Johnson* v. *De Grandy, supra,* at 1011–1012; *Thornburg* v. *Gingles,* 478 U. S., at 98–100 (O'CONNOR, J., concurring in judgment). In assessing the comparative weight of these influence districts, it is important to consider "the likelihood that candidates elected without decisive minority support would be willing to take the minority's interests into account." *Id.,* at 100 (O'CONNOR, J., concurring in judgment). In fact, various studies have suggested that the most effective way to maximize minority voting strength may be to create more influence or coalitional districts. See, *e. g.,* Lublin, Racial Redistricting and African-American Representation: A Critique of "Do Majority-Minority Districts Maximize Substantive Black Representation in Congress?" 93 Am. Pol. Sci. Rev. 183, 185 (1999) (noting that racial redistricting in the early 1990's, which created more majority-minority districts, made Congress "less likely to adopt initiatives supported by blacks"); Cameron, Epstein, &

O'Halloran, Do Majority-Minority Districts Maximize Substantive Black Representation in Congress? 90 Am. Pol. Sci. Rev. 794, 808 (1996) (concluding that the "[d]istricting schemes that maximize the number of minority representatives do not necessarily maximize substantive minority representation"); C. Swain, Black Faces, Black Interests 193–234 (1995); Pildes, 80 N. C. L. Rev., at 1517; Grofman, Handley, & Lublin, Drawing Effective Minority Districts: A Conceptual Framework and Some Empirical Evidence, 79 N. C. L. Rev. 1383 (2001).

Section 5 leaves room for States to use these types of influence and coalitional districts. Indeed, the State's choice ultimately may rest on a political choice of whether substantive or descriptive representation is preferable. See Pitkin, *supra*, at 142; Swain, *supra*, at 5. The State may choose, consistent with § 5, that it is better to risk having fewer minority representatives in order to achieve greater overall representation of a minority group by increasing the number of representatives sympathetic to the interests of minority voters. See *Thornburg* v. *Gingles, supra*, at 87–89, 99 (O'CONNOR, J., concurring in judgment); cf. *Johnson* v. *De Grandy*, 512 U. S., at 1020.

In addition to influence districts, one other method of assessing the minority group's opportunity to participate in the political process is to examine the comparative position of legislative leadership, influence, and power for representatives of the benchmark majority-minority districts. A legislator, no less than a voter, is "not immune from the obligation to pull, haul, and trade to find common political ground." *Ibid.* Indeed, in a representative democracy, the very purpose of voting is to delegate to chosen representatives the power to make and pass laws. The ability to exert more control over that process is at the core of exercising political power. A lawmaker with more legislative influence has more potential to set the agenda, to participate in closed-door meetings, to negotiate from a stronger position, and to

shake hands on a deal. Maintaining or increasing legislative positions of power for minority voters' representatives of choice, while not dispositive by itself, can show the lack of retrogressive effect under § 5.

And it is also significant, though not dispositive, whether the representatives elected from the very districts created and protected by the Voting Rights Act support the new districting plan. The District Court held that the support of legislators from benchmark majority-minority districts may show retrogressive purpose, but it is not relevant in assessing retrogressive effect. See 195 F. Supp. 2d, at 89; see also *post*, at 503 (SOUTER, J., dissenting). But we think this evidence is also relevant for retrogressive effect. As the dissent recognizes, the retrogression inquiry asks how "voters will probably act in the circumstances in which they live." *Post*, at 509. The representatives of districts created to ensure continued minority participation in the political process have some knowledge about how "voters will probably act" and whether the proposed change will decrease minority voters' effective exercise of the electoral franchise.

The dissent maintains that standards for determining nonretrogression under § 5 that we announce today create a situation where "[i]t is very hard to see anything left of" § 5. *Post*, at 495. But the dissent ignores that the ability of a minority group to elect a candidate of choice remains an integral feature in any § 5 analysis. Cf. *Thornburg* v. *Gingles*, *supra*, at 98 (O'CONNOR, J., concurring in judgment). And the dissent agrees that the addition or subtraction of coalitional districts is relevant to the § 5 inquiry. See *post*, at 492, 504. Yet assessing whether a plan with coalitional districts is retrogressive is just as fact-intensive as whether a plan with both influence and coalitional districts is retrogressive. As JUSTICE SOUTER recognized for the Court in the § 2 context, a court or the Department of Justice should assess the totality of circumstances in determining retrogression under § 5. See *Johnson* v. *De Grandy, supra,* at

1020–1021. And it is of course true that evidence of racial polarization is one of many factors relevant in assessing whether a minority group is able to elect a candidate of choice or to exert a significant influence in a particular district. See *Thornburg* v. *Gingles*, 478 U. S., at 37; *id.*, at 100–104 (O'CONNOR, J., concurring in judgment); see also *White* v. *Regester*, 412 U. S. 755 (1973); *Zimmer* v. *McKeithen*, 485 F. 2d 1297 (CA5 1973) (en banc).

The dissent nevertheless asserts that it "cannot be right" that the § 5 inquiry goes beyond assessing whether a minority group can elect a candidate of its choice. *Post*, at 494. But except for the general statement of retrogression in *Beer*, the dissent cites no law to support its contention that retrogression should focus solely on the ability of a minority group to elect a candidate of choice. As JUSTICE SOUTER himself, writing for the Court in *Johnson* v. *De Grandy*, *supra*, at 1011–1012, has recognized, the "extent of the opportunities minority voters enjoy to participate in the political processes" is an important factor to consider in assessing a § 2 vote-dilution inquiry. See also *Thornburg* v. *Gingles*, *supra*, at 98–100 (O'CONNOR, J., concurring in judgment). In determining how the new districting plan differs from the benchmark plan, the same standard should apply to § 5.

C

The District Court failed to consider all the relevant factors when it examined whether Georgia's Senate plan resulted in a retrogression of black voters' effective exercise of the electoral franchise. First, while the District Court acknowledged the importance of assessing the statewide plan as a whole, the court focused too narrowly on proposed Senate Districts 2, 12, and 26. It did not examine the increases in the black voting age population that occurred in many of the other districts. Second, the District Court did not explore in any meaningful depth any other factor beyond the comparative ability of black voters in the majority-

minority districts to elect a candidate of their choice. In doing so, it paid inadequate attention to the support of legislators representing the benchmark majority-minority districts and the maintenance of the legislative influence of those representatives.

The District Court correctly recognized that the increase in districts with a substantial minority of black voters is an important factor in the retrogression inquiry. See 195 F. Supp. 2d, at 75–78. Nevertheless, it did not adequately apply this consideration to the facts of this case. The District Court ignored the evidence of numerous other districts showing an increase in black voting age population, as well as the other evidence that Georgia decided that a way to increase black voting strength was to adopt a plan that "unpacked" the high concentration of minority voters in the majority-minority districts. Its statement that Georgia did not "presen[t] evidence regarding potential gains in minority voting strength in Senate Districts other than Districts 2, 12 and 26" is therefore clearly erroneous. *Id.*, at 94. Like the dissent, we accept the District Court's findings that the reductions in black voting age population in proposed Districts 2, 12, and 26 to just over 50% make it marginally less likely that minority voters can elect a candidate of their choice in those districts, although we note that Georgia introduced evidence showing that approximately one-third of white voters would support a black candidate in those districts, see *id.*, at 66, and that the United States' own expert admitted that the results of statewide elections in Georgia show that "there would be a 'very good chance' that . . . African American candidates would win election in the reconstituted districts." *Id.*, at 71; see also *id.*, at 84–85. Nevertheless, regardless of any racially polarized voting or diminished opportunity for black voters to elect a candidate of their choice in proposed Districts 2, 12, and 26, the District Court's inquiry was too narrow.

In the face of Georgia's evidence that the Senate plan as a whole is not retrogressive, the United States introduced nothing apart from the evidence that it would be more difficult for minority voters to elect their candidate of choice in Districts 2, 12, and 26. As the District Court stated, the United States did not introduce any evidence to rebut Georgia's evidence that the increase in black voting age population in the other districts offsets any decrease in black voting age population in the three contested districts: "[T]he United States' evidence was extremely limited in scope—focusing only on three contested districts in the State Senate plan." *Id.*, at 37. Indeed, the District Court noted that the United States' evidence "was not designed to permit the court to assess the overall impact" of the Senate plan. *Ibid.*

Given the evidence submitted in this case, we find that Georgia likely met its burden of showing nonretrogression. The increase in black voting age population in the other districts likely offsets any marginal decrease in the black voting age population in the three districts that the District Court found retrogressive. Using the overlay of the 2000 census numbers, Georgia's strategy of "unpacking" minority voters in some districts to create more influence and coalitional districts is apparent. Under the 2000 census numbers, the number of majority black voting age population districts in the new plan increases by one, the number of districts with a black voting age population of between 30% and 50% increases by two, and the number of districts with a black voting age population of between 25% and 30% increases by another 2. See Pl. Exhs. 1D, 2C; see also *supra*, at 470–471.

Using the census numbers in effect at the time the benchmark plan was enacted to assess the benchmark plan, the difference is even more striking. Under those figures, the new plan increases from 10 to 13 the number of districts with a majority-black voting age population and increases from 8 to 13 the number of districts with a black voting age population of between 30% and 50%. See Pl. Exhs. 1C, 2C. Thus,

the new plan creates 8 new districts—out of 56—where black voters as a group can play a substantial or decisive role in the electoral process. Indeed, under the census figures in use at the time Georgia enacted its benchmark plan, the black voting age population in Districts 2, 12, and 26 does not decrease to the extent indicated by the District Court. District 2 drops from 59.27% black voting age population to 50.31%. District 26 drops from 53.45% black voting age population to 50.80%. And District 12 actually *increases*, from 46.50% black voting age population to 50.66%. See Pl. Exhs. 1C, 2C.[2] And regardless of any potential retrogression in some districts, § 5 permits Georgia to offset the decline in those districts with an increase in the black voting age population in other districts. The testimony from those who designed the Senate plan confirms what the statistics suggest—that Georgia's goal was to "unpack" the minority voters from a few districts to increase blacks' effective exer-

---

[2] The dissent summarily rejects any inquiry into the benchmark plan using the census numbers in effect at the time the redistricting plan was passed. See *post,* at 506. Yet we think it is relevant to examine how the new plan differs from the benchmark plan as originally enacted by the legislature. The § 5 inquiry, after all, revolves around the change from the previous plan. The 1990 census numbers are far from "irrelevant." *Ibid.* Rather, examining the benchmark plan with the census numbers in effect at the time the State enacted its plan comports with the one-person, one-vote principle of *Reynolds* v. *Sims,* 377 U. S. 533 (1964), and its progeny. When the decennial census numbers are released, States must redistrict to account for any changes or shifts in population. But before the new census, States operate under the legal fiction that even 10 years later, the plans are constitutionally apportioned. After the new enumeration, no districting plan is likely to be legally enforceable if challenged, given the shifts and changes in a population over 10 years. And if the State has not redistricted in response to the new census figures, a federal court will ensure that the districts comply with the one-person, one-vote mandate before the next election. See, *e. g., Branch* v. *Smith,* 538 U. S. 254 (2003); *Lawyer* v. *Department of Justice,* 521 U. S. 567 (1997); *Growe* v. *Emison,* 507 U. S. 25 (1993).

cise of the electoral franchise in more districts.  See *supra*, at 469–471.

Other evidence supports the implausibility of finding retrogression here.  An examination of black voters' opportunities to participate in the political process shows, if anything, an increase in the effective exercise of the electoral franchise.  It certainly does not indicate retrogression.  The 34 districts in the proposed plan with a black voting age population of above 20% consist almost entirely of districts that have an overall percentage of Democratic votes of above 50%.  See Pl. Exh. 2D.  The one exception is proposed District 4, with a black voting age population of 30.51% and an overall Democratic percentage of 48.86%.  See *ibid.*  These statistics make it more likely as a matter of fact that black voters will constitute an effective voting bloc, even if they cannot always elect the candidate of their choice.  See *Thornburg* v. *Gingles*, 478 U. S., at 100 (O'CONNOR, J., concurring in judgment).  These statistics also buttress the testimony of the designers of the plan such as Senator Brown, who stated that the goal of the plan was to maintain or increase black voting strength and relatedly to increase the prospects of Democratic victory.  See *supra*, at 469–470.

The testimony of Congressman John Lewis is not so easily dismissed.  Congressman Lewis is not a member of the State Senate and thus has less at stake personally in the outcome of this litigation.  Congressman Lewis testified that "giving real power to black voters comes from the kind of redistricting efforts the State of Georgia has made," and that the Senate plan "will give real meaning to voting for African Americans" because "you have a greater chance of putting in office people that are going to be responsive."  Pl. Exh. 21, at 21–23.  Section 5 gives States the flexibility to implement the type of plan that Georgia has submitted for preclearance—a plan that increases the number of districts with a majority-black voting age population, even if it means that in some of those districts, minority voters will face a

somewhat reduced opportunity to elect a candidate of their choice. Cf. *Thornburg* v. *Gingles, supra,* at 89 (O'CONNOR, J., concurring in judgment).

The dissent's analysis presumes that we are deciding that Georgia's Senate plan is not retrogressive. See *post,* at 501–508. To the contrary, we hold only that the District Court did not engage in the correct retrogression analysis because it focused too heavily on the ability of the minority group to elect a candidate of its choice in the majority-minority districts. While the District Court engaged in a thorough analysis of the issue, we must remand the case for the District Court to examine the facts using the standard that we announce today. We leave it for the District Court to determine whether Georgia has indeed met its burden of proof. The dissent justifies its conclusion here on the ground that the District Court did not clearly err in its factual determination. But the dissent does not appear to dispute that if the District Court's legal standard was incorrect, the decision below should be vacated.

The purpose of the Voting Rights Act is to prevent discrimination in the exercise of the electoral franchise and to foster our transformation to a society that is no longer fixated on race. Cf. *Johnson* v. *De Grandy,* 512 U. S., at 1020; *Shaw* v. *Reno,* 509 U. S., at 657. As Congressman Lewis stated: "I think that's what the [civil rights] struggle was all about, to create what I like to call a truly interracial democracy in the South. In the movement, we would call it creating the beloved community, an all-inclusive community, where we would be able to forget about race and color and see people as people, as human beings, just as citizens." Pl. Exh. 21, at 14. While courts and the Department of Justice should be vigilant in ensuring that States neither reduce the effective exercise of the electoral franchise nor discriminate against minority voters, the Voting Rights Act, as properly interpreted, should encourage the transition to a society where race no longer matters: a society where integration

and color-blindness are not just qualities to be proud of, but are simple facts of life. See *Shaw* v. *Reno, supra,* at 657.

## IV

The District Court is in a better position to reweigh all the facts in the record in the first instance in light of our explication of retrogression. The judgment of the District Court for the District of Columbia, accordingly, is vacated, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE KENNEDY, concurring.

As is evident from the Court's accurate description of the facts in this case, race was a predominant factor in drawing the lines of Georgia's State Senate redistricting map. If the Court's statement of facts had been written as the preface to consideration of a challenge brought under the Equal Protection Clause or under § 2 of the Voting Rights Act of 1965, a reader of the opinion would have had sound reason to conclude that the challenge would succeed. Race cannot be the predominant factor in redistricting under our decision in *Miller* v. *Johnson,* 515 U. S. 900 (1995). Yet considerations of race that would doom a redistricting plan under the Fourteenth Amendment or § 2 seem to be what save it under § 5.

I agree that our decisions controlling the § 5 analysis require the Court's ruling here. See, *e. g., Reno* v. *Bossier Parish School Bd.,* 520 U. S. 471 (1997); *Reno* v. *Bossier Parish School Bd.,* 528 U. S. 320 (2000). The discord and inconsistency between §§ 2 and 5 should be noted, however; and in a case where that issue is raised, it should be confronted. There is a fundamental flaw, I should think, in any scheme in which the Department of Justice is permitted or directed to encourage or ratify a course of unconstitutional conduct in order to find compliance with a statutory directive. This serious issue has not been raised here, and, as already ob-

served, the Court is accurate both in its summary of the facts and in its application of the controlling precedents. With these observations, I join the opinion of the Court.

JUSTICE THOMAS, concurring.

I continue to adhere to the views expressed in my opinion in *Holder* v. *Hall*, 512 U. S. 874, 891 (1994) (opinion concurring in judgment). I join the Court's opinion because it is fully consistent with our § 5 precedents.

JUSTICE SOUTER, with whom JUSTICE STEVENS, JUSTICE GINSBURG, and JUSTICE BREYER join, dissenting.

I

I agree with the Court that reducing the number of majority-minority districts within a State would not necessarily amount to retrogression barring preclearance under § 5 of the Voting Rights Act of 1965. See *ante*, at 480–482. The prudential objective of § 5 is hardly betrayed if a State can show that a new districting plan shifts from supermajority districts, in which minorities can elect their candidates of choice by their own voting power, to coalition districts, in which minorities are in fact shown to have a similar opportunity when joined by predictably supportive nonminority voters. Cf. *Johnson* v. *De Grandy*, 512 U. S. 997, 1020 (1994) (explaining in the context of § 2 that although "society's racial and ethnic cleavages sometimes necessitate majority-minority districts to ensure equal political and electoral opportunity, that should not obscure the fact that there are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice").

Before a State shifts from majority-minority to coalition districts, however, the State bears the burden of proving that nonminority voters will reliably vote along with the minority. See, *e. g.*, *Reno* v. *Bossier Parish School Bd.*, 520

U. S. 471, 478 (1997). It must show not merely that minority voters in new districts may have some influence, but that minority voters will have effective influence translatable into probable election results comparable to what they enjoyed under the existing district scheme. And to demonstrate this, a State must do more than produce reports of minority voting age percentages; it must show that the probable voting behavior of nonminority voters will make coalitions with minorities a real prospect. See, *e. g.*, Pildes, Is Voting-Rights Law Now at War With Itself? Social Science and Voting Rights in the 2000s, 80 N. C. L. Rev. 1517, 1539 (2002). If the State's evidence fails to convince a factfinder that high racial polarization in voting is unlikely, or that high white crossover voting is likely, or that other political and demographic facts point to probable minority effectiveness, a reduction in supermajority districts must be treated as potentially and fatally retrogressive, the burden of persuasion always being on the State.

The District Court majority perfectly well understood all this and committed no error. Error enters this case here in this Court, whose majority unmoors § 5 from any practical and administrable conception of minority influence that would rule out retrogression in a transition from majority-minority districts, and mistakes the significance of the evidence supporting the District Court's decision.

## II

The Court goes beyond recognizing the possibility of coalition districts as nonretrogressive alternatives to those with majorities of minority voters when it redefines effective voting power in § 5 analysis without the anchoring reference to electing a candidate of choice. It does this by alternatively suggesting that a potentially retrogressive redistricting plan could satisfy § 5 if a sufficient number of so-called "influence districts," in addition to "coalitio[n] districts," were created, *ante*, at 483, 484, or if the new plan provided minority groups

with an opportunity to elect a particularly powerful candidate, *ante*, at 483–484. On either alternative, the § 5 requirement that voting changes be nonretrogressive is substantially diminished and left practically unadministrable.

### A

The Court holds that a State can carry its burden to show a nonretrogressive degree of minority "influence" by demonstrating that "'candidates elected without decisive minority support would be willing to take the minority's interests into account.'" *Ante*, at 482 (quoting *Thornburg* v. *Gingles*, 478 U. S. 30, 100 (1986) (O'CONNOR, J., concurring in judgment)). But this cannot be right.

The history of § 5 demonstrates that it addresses changes in state law intended to perpetuate the exclusion of minority voters from the exercise of political power. When this Court held that a State must show that any change in voting procedure is free of retrogression it meant that changes must not leave minority voters with less chance to be effective in electing preferred candidates than they were before the change. "[T]he purpose of § 5 has always been to insure that no voting-procedure changes would be made that would lead to a retrogression in the position of racial minorities with respect to their effective exercise of the electoral franchise." *Beer* v. *United States*, 425 U. S. 130, 141 (1976); see, *e. g.*, *id.*, at 140–141 ("Section 5 was intended 'to insure that [the gains thus far achieved in minority political participation] shall not be destroyed through new [discriminatory] procedures and techniques'" (quoting S. Rep. No. 94–295, p. 19 (1975))). In addressing the burden to show no retrogression, therefore, "influence" must mean an opportunity to exercise power effectively.

The Court, however, says that influence may be adequate to avoid retrogression from majority-minority districts when it consists not of decisive minority voting power but of sentiment on the part of politicians: influence may be sufficient

when it reflects a willingness on the part of politicians to consider the interests of minority voters, even when they do not need the minority votes to be elected. The Court holds, in other words, that there would be no retrogression when the power of a voting majority of minority voters is eliminated, so long as elected politicians can be expected to give some consideration to minority interests.

The power to elect a candidate of choice has been forgotten; voting power has been forgotten. It is very hard to see anything left of the standard of nonretrogression, and it is no surprise that the Court's cited precedential support for this reconception, see *ante*, at 482, consists of a footnote from a dissenting opinion in *Shaw* v. *Hunt*, 517 U. S. 899 (1996), and footnote dictum in a case from the Western District of Louisiana.

Indeed, to see the trouble ahead, one need only ask how on the Court's new understanding, state legislators or federal preclearance reviewers under §5 are supposed to identify or measure the degree of influence necessary to avoid the retrogression the Court nominally retains as the §5 touchstone. Is the test purely *ad hominem*, looking merely to the apparent sentiments of incumbents who might run in the new districts? Would it be enough for a State to show that an incumbent had previously promised to consider minority interests before voting on legislative measures? Whatever one looks to, however, how does one put a value on influence that falls short of decisive influence through coalition? Nondecisive influence is worth less than majority-minority control, but how much less? Would two influence districts offset the loss of one majority-minority district? Would it take three? Or four? The Court gives no guidance for measuring influence that falls short of the voting strength of a coalition member, let alone a majority of minority voters. Nor do I see how the Court could possibly give any such guidance. The Court's "influence" is simply not functional in the political and judicial worlds.

B

Identical problems of comparability and administrability count at least as much against the Court's further gloss on nonretrogression, in its novel holding that a State may trade off minority voters' ability to elect a candidate of their choice against their ability to exert some undefined degree of influence over a candidate likely to occupy a position of official legislative power. See *ante*, at 483–484. The Court implies that one majority-minority district in which minority voters could elect a legislative leader could replace a larger number of majority-minority districts with ordinary candidates, without retrogression of overall minority voting strength. Under this approach to § 5, a State may value minority votes in a district in which a potential committee chairman might be elected differently from minority votes in a district with ordinary candidates.

It is impossible to believe that Congress could ever have imagined § 5 preclearance actually turning on any such distinctions. In any event, if the Court is going to allow a State to weigh minority votes by the ambitiousness of candidates the votes might be cast for, it is hard to see any stopping point. I suppose the Court would not go so far as to give extra points to an incumbent with the charisma to attract a legislative following, but would it value all committee chairmen equally? (The committee chairmen certainly would not.) And what about a legislator with a network of influence that has made him a proven dealmaker? Thus, again, the problem of measurement: is a shift from 10 majority-minority districts to 8 offset by a good chance that 1 of the 8 may elect a new Speaker of the House?

I do not fault the Court for having no answers to these questions, for there are no answers of any use under § 5. The fault is more fundamental, and the very fact that the Court's interpretation of nonretrogression under § 5 invites unanswerable questions points to the error of a § 5 preclearance regime that defies reviewable administration. We are

left with little hope of determining practically whether a districting shift to one party's overall political advantage can be expected to offset a loss of majority-minority voting power in particular districts; there will simply be greater opportunity to reduce minority voting strength in the guise of obtaining party advantage.

One is left to ask who will suffer most from the Court's new and unquantifiable standard. If it should turn out that an actual, serious burden of persuasion remains on the States, States that rely on the new theory of influence should be guaranteed losers: nonretrogression cannot be demonstrated by districts with minority influence too amorphous for objective comparison. But that outcome is unlikely, and if in subsequent cases the Court allows the State's burden to be satisfied on the pretense that unquantifiable influence can be equated with majority-minority power, § 5 will simply drop out as a safeguard against the "unremitting and ingenious defiance of the Constitution" that required the procedure of preclearance in the first place. *South Carolina* v. *Katzenbach*, 383 U. S. 301, 309 (1966).

## III

The District Court never reached the question the Court addresses, of what kind of influence districts (coalition or not) might demonstrate that a decrease in majority-minority districts was not retrogressive. It did not reach this question because it found that the State had not satisfied its burden of persuasion on an issue that should be crucial on any administrable theory: [1] the State had not shown the possibility

---

[1] The District Court correctly recognized that the State bears the burden of proof in establishing that its proposed redistricting plan satisfied the standards of § 5. See, *e. g.*, 195 F. Supp. 2d 25, 86 (DC 2002) ("We look to the State to explain why retrogression is not present"); see also *Reno* v. *Bossier Parish School Bd.*, 520 U. S. 471, 478 (1997) (covered jurisdiction "bears the burden of proving that the change does not have the purpose and will not have the effect of denying or abridging the right to vote on

of actual coalitions in the affected districts that would allow any retreat from majority-minority districts without a retrogressive effect. This central evidentiary finding is invulnerable under the correct standard of review.

This Court's review of the District Court's factual findings is for clear error. See, *e. g., Miller* v. *Johnson,* 515 U. S. 900, 917 (1995); *Pleasant Grove* v. *United States,* 479 U. S. 462, 469 (1987); *McCain* v. *Lybrand,* 465 U. S. 236, 258 (1984); *City of Lockhart* v. *United States,* 460 U. S. 125, 136 (1983). We have no business disturbing the District Court's ruling "simply because we would have decided the case differently," but only if based "on the entire evidence, [we are] left with the definite and firm conviction that a mistake has been committed." *Easley* v. *Cromartie,* 532 U. S. 234, 242 (2001) (internal quotation marks omitted). It is not, then, up to us to "decide whether Georgia's State Senate redistricting plan is retrogressive as compared to its previous, benchmark districting plan." *Ante,* at 466. Our sole responsibility is to see whether the District Court committed clear error in refusing to preclear the plan. It did not.

## A

The District Court began with the acknowledgment (to which we would all assent) that the simple fact of a decrease in black voting age population (BVAP) in some districts is not alone dispositive about whether a proposed plan is retrogressive:

---

account of race or color" (internal quotation marks omitted)); *id.,* at 480 (Section 5 "imposes upon a covered jurisdiction the difficult burden of proving the *absence* of discriminatory purpose and effect"); *Reno* v. *Bossier Parish School Bd.,* 528 U. S. 320, 332 (2000) ("In the specific context of § 5 . . . the covered jurisdiction has the burden of persuasion"); cf. *Beer* v. *United States,* 425 U. S. 130, 140 (1976) (Congress in passing § 5 sought to "freez[e] election procedures in the covered areas unless the changes can be shown to be nondiscriminatory" (internal quotation marks omitted)).

" 'Unpacking' African American districts may have positive or negative consequences for the statewide electoral strength of African American voters. To the extent that voting patterns suggest that minority voters are in a better position to join forces with other segments of the population to elect minority preferred candidates, a decrease in a district's BVAP may have little or no effect on minority voting strength." 195 F. Supp. 2d 25, 76 (DC 2002).

See *id.*, at 78 ("[T]he Voting Rights Act allows states to adopt plans that move minorities out of districts in which they formerly constituted a majority of the voting population, provided that racial divisions have healed to the point that numerical reductions will not necessarily translate into reductions in electoral power"); *id.*, at 84 ("[T]he mere fact that BVAP decreases in certain districts is not enough to deny preclearance to a plan under Section 5").[2]

The District Court recognized that the key to understanding the impact of drops in a district's BVAP on the minority group's "effective exercise of the electoral franchise," *Beer*, 425 U. S., at 141, is the level of racial polarization. If racial elements consistently vote in separate blocs, decreasing the proportion of black voters will generally reduce the chance that the minority group's favored candidate will be elected; whereas in districts with low racial bloc voting or significant white crossover voting, a decrease in the black proportion may have no effect at all on the minority's opportunity to elect their candidate of choice. See, *e. g.*, 195 F. Supp. 2d, at 84 ("[R]acial polarization is critically important because its presence or absence in the Senate Districts challenged by the United States goes a long way to determining whether

---

[2] Indeed, the other plans approved by the District Court, Georgia's State House plan, 195 F. Supp. 2d, at 95, congressional plan, *ibid.*, and the interim plan approved for the State Senate, 204 F. Supp. 2d 4, 7 (DC 2002), all included decreases in BVAP in particular districts.

or not the decreases in BVAP and African American voter registration in those districts are likely to produce retrogressive effects").

This indisputable recognition, that context determines the effect of decreasing minority numbers for purposes of the § 5 enquiry, points to the nub of this case, and the District Court's decision boils down to a judgment about what the evidence showed about that context. The District Court found that the United States had offered evidence of racial polarization in the contested districts,[3] *id.*, at 86, and it found that Georgia had failed to present anything relevant on that issue. Georgia, the District Court said, had "provided the court with no competent, comprehensive information regarding white crossover voting or levels of polarization in individual districts across the State." *Id.*, at 88. In particular, the District Court found it "impossible to extrapolate" anything about the level of racial polarization from the statistical submissions of Georgia's lone expert witness. *Id.*, at 85. And the panel majority took note that Georgia's expert "admitted on cross-examination" that his evidence simply did not address racial polarization: "the whole point of my analysis," the expert stated, "is not to look at polarization per se. The question is not whether or not blacks and whites in general vote for different candidates." *Ibid.* (internal quotation marks omitted).

Accordingly, the District Court explained that Georgia's expert:

---

[3] The majority cites the District Court's comment that "'the United States' evidence was extremely limited in scope—focusing only on three contested districts in the State Senate plan.'" *Ante*, at 474 (quoting 195 F. Supp. 2d, at 37). The District Court correctly did not require the United States to prove that the plan was retrogressive. As the District Court explained: "[u]ltimately, the burden of proof in this matter lies with the State. We look to the State to explain why retrogression is not present, and to prove the absence of racially polarized voting that might diminish African American voting strength in light of several districts' decreased BVAPs." *Id.*, at 86.

"made no attempt to address the central issue before the court: whether the State's proposal is retrogressive. He failed even to identify the decreases in BVAP that would occur under the proposed plan, and certainly did not identify corresponding reductions in the electability of African American candidates of choice. The paucity of information in [the expert's] report thus leaves us unable to use his analysis to assess the expected change in African American voting strength statewide that will be brought by the proposed Senate plan." *Id.*, at 81.

## B

How is it, then, that the majority of this Court speaks of "Georgia's evidence that the Senate plan as a whole is not retrogressive," against which "the United States did not introduce any evidence [in] rebut[tal]," *ante*, at 487? The answer is that the Court is not engaging in review for clear error. Instead, it is reweighing evidence *de novo*, discovering what it thinks the District Court overlooked, and drawing evidentiary conclusions the District Court supposedly did not see. The Court is mistaken on all points.

### 1

Implicitly recognizing that evidence of voting behavior by majority voters is crucial to any showing of nonretrogression when minority numbers drop under a proposed plan, the Court tries to find evidence to fill the record's gap. It says, for example, that "Georgia introduced evidence showing that approximately one-third of white voters would support a black candidate in [the contested] districts." *Ante*, at 486. In support of this claim, however, the majority focuses on testimony offered by Georgia's expert relating to crossover voting in the pre-existing rather than proposed districts. 195 F. Supp. 2d, at 66. The District Court specifically noted that the expert did not calculate crossover voting under the proposed plan. *Id.*, at 65, n. 31 ("The court also emphasizes

that Epstein did not attempt to rely on the table's calculations to demonstrate voting patterns in the districts, and calculated crossover in the existing, and not the proposed, Senate districts"). Indeed, in relying on this evidence the majority attributes a significance to it that Georgia's own expert disclaimed, as the District Court pointed out. See *id.*, at 85 ("[I]t is impossible to extrapolate these voting patterns from Epstein's database. As Epstein admitted on cross-examination: the whole point of my analysis is not to look at polarization per se. The question is not whether or not blacks and whites in general vote for different candidates" (internal quotation marks omitted)).

2

In another effort to revise the record, the Court faults the District Court, alleging that it "focused too narrowly on proposed Senate Districts 2, 12, and 26." *Ante*, at 485. In fact, however, it is Georgia that asked the District Court to consider only the contested districts, and the District Court explicitly refused to limit its review in any such fashion: "we reject the State's argument that this court's review is limited only to those districts challenged by the United States, and should not encompass the redistricting plans in their entirety. . . . [T]he court's review necessarily extends to the entire proposed plan." 195 F. Supp. 2d, at 73. The District Court explained that it "is vested with the final authority to approve or disapprove the proposed change as a whole." *Ibid.* "The question before us is whether the proposed Senate plan as a whole, has the 'purpose or effect of denying or abridging the right to vote on account of race or color.'" *Id.*, at 103 (Oberdorfer, J., concurring in part and dissenting in part) (quoting 42 U. S. C. § 1973c). Though the majority asserts that "[t]he District Court ignored the evidence of numerous other districts showing an increase in black voting age population," *ante*, at 486, the District Court, in fact, specifically considered the parties' dispute over the statewide

impact of the change in black voting age population. See, *e. g.,* 195 F. Supp. 2d, at 93 ("The number of Senate Districts with majorities of BVAP would, according to Georgia's calculations, increase from twelve to thirteen; according to the Attorney General's interpretation of the census data, the number would decrease from twelve to eleven").

3

In a further try to improve the record, the Court focuses on the testimony of certain lay witnesses, politicians presented by the State to support its claim that the Senate plan is not retrogressive. Georgia, indeed, relied heavily on the near unanimity of minority legislators' support for the plan. But the District Court did not overlook this evidence; it simply found it inadequate to carry the State's burden of showing nonretrogression. The District Court majority explained that the "legislators' support is, in the end, far more probative of a lack of retrogressive *purpose* than of an absence of retrogressive *effect." Id.,* at 89 (emphasis in original). As against the politicians' testimony, the District Court had contrary "credible," *id.,* at 88, evidence of retrogressive effect. This evidence was the testimony of the expert witness presented by the United States, which "suggests the existence of highly racially polarized voting in the proposed districts," *ibid.,* evidence of retrogressive effect to which Georgia offered "no competent" response, *ibid.* The District Court was clearly within bounds in finding that (1) Georgia's proposed plan decreased BVAP in the relevant districts, (2) the United States offered evidence of significant racial polarization in those districts, and (3) Georgia offered no adequate response to this evidence.

The reasonableness of the District Court's treatment of the evidence is underscored in its concluding reflection that it was possible Georgia could have shown the plan to be nonretrogressive, but the evidence the State had actually offered simply failed to do that. "There are, without doubt,

numerous other ways, given the limited evidence of racially polarized voting in State Senate and local elections, that Georgia could have met its burden of proof in this case. Yet, the court is limited to reviewing the evidence presented by the parties, and is compelled to hold that the State has not met its burden." *Id.*, at 94. "[T]he lack of positive racial polarization data was the gap at the center of the State's case [and] the evidence presented by [the] estimable [legislators] does not come close to filling that void." *Id.*, at 100.

As must be plain, in overturning the District Court's thoughtful consideration of the evidence before it, the majority of this Court is simply rejecting the District Court's evidentiary finding in favor of its own. It is reweighing testimony and making judgments about the competence, interest, and character of witnesses. The Court is not conducting clear error review.

4

Next, the Court attempts to fill the holes in the State's evidence on retrogression by drawing inferences favorable to the State from undisputed statistics. See *ante*, at 487–489. This exercise comes no closer to demonstrating clear error than the others considered so far.

In the first place, the District Court has already explained the futility of the Court's effort. Knowing whether the number of majority BVAP districts increases, decreases, or stays the same under a proposed plan does not alone allow any firm conclusion that minorities will have a better, or worse, or unvarying opportunity to elect their candidates of choice. Any such inference must depend not only on trends in BVAP levels, but on evidence of likely voter turnout among minority and majority groups, patterns of racial bloc voting, likelihood of white crossover voting, and so on.[4] In-

---

[4] The fact that the Court premises its analysis on BVAP alone is ironic given that the Court, incorrectly, chastises the District Court for committing the very error the Court now engages in, "fail[ing] to consider all the relevant factors." *Ante*, at 485.

deed, the core holding of the Court today, with which I agree, that nonretrogression does not necessarily require maintenance of existing supermajority minority districts, turns on this very point; comparing the number of majority-minority districts under existing and proposed plans does not alone reliably indicate whether the new plan is retrogressive.

Lack of contextual evidence is not, however, the only flaw in the Court's numerical arguments. Thus, in its first example, *ante*, at 487, the Court points out that under the proposed plan the number of districts with majority BVAP increases by one over the existing plan,[5] but the Court does not mention that the number of districts with BVAP levels over 55% decreases by four. See Record, Doc. No. 148, Pl. Exhs. 1D, 2C. Similarly, the Court points to an increase of two in districts with BVAP in the 30% to 50% range, along with a further increase of two in the 25% to 30% range. *Ante*, at 487. It fails to mention, however, that Georgia's own expert argued that 44.3% was the critical threshold for BVAP levels, 195 F. Supp. 2d, at 107, and the data on which the Court relies shows the number of districts with BVAP over 40% actually decreasing by one, see Record, Doc. No. 148, Pl. Exhs. 1D, 2C. My point is not that these figures conclusively demonstrate retrogression; I mean to say only that percentages tell us nothing in isolation, and that without contextual evidence the raw facts about population levels fail to get close to indicating that the State carried its burden to show no retrogression. They do not come close to showing clear error.

---

[5] Though the Court does not acknowledge it in its discussion of why "Georgia likely met its burden," *ante*, at 487, even this claim was disputed. As the District Court explained: "[t]he number of Senate Districts with majorities of BVAP would, according to Georgia's calculations, increase from twelve to thirteen; according to the Attorney General's interpretation of the census data, the number would decrease from twelve to eleven." 195 F. Supp. 2d, at 93.

5

Nor could error, clear or otherwise, be shown by the Court's comparison of the proposed plan with the description of the State and its districts provided by the 1990 census. *Ante*, at 487–489. The 1990 census is irrelevant. We have the 2000 census, and precedent confirms in no uncertain terms that the issue for § 5 purposes is not whether Georgia's proposed plan would have had a retrogressive effect 13 years ago: the question is whether the proposed plan would be retrogressive now. See, *e. g., Reno* v. *Bossier Parish School Bd.,* 528 U. S. 320, 334 (2000) (Under § 5 "the baseline is the status quo that is proposed to be changed"); *Holder* v. *Hall,* 512 U. S. 874, 883 (1994) (plurality opinion) (Under § 5, "[t]he baseline for comparison is present by definition; it is the existing status"); *City of Lockhart* v. *United States,* 460 U. S., at 132 ("The proper comparison is between the new system and the system actually in effect"); Cf. 28 CFR § 51.54(b)(2) (2002) (when determining if a change is retrogressive under § 5 "[t]he Attorney General will make the comparison based on the conditions existing at the time of the submission"). The Court's assumption that a proper § 5 analysis may proceed on the basis of obsolete data from a superseded census is thus as puzzling as it is unprecedented. It is also an invitation to perverse results, for if a State could carry its burden under § 5 merely by showing no retrogression from the state of affairs 13 years ago, it could demand preclearance for a plan flatly diminishing minority voting strength under § 5.[6]

---

[6] For example, if a covered jurisdiction had two majority-minority districts in 1990, but rapidly changing demography had produced two more during the ensuing decade, a new redistricting plan, setting the number of majority-minority districts at three would conclusively rule out retrogression on the Court's calculus. This would be the case even when voting behavior showed that nothing short of four majority-minority districts would preserve the status quo as of 2000.

6

The Court's final effort to demonstrate that Georgia's plan is nonretrogressive focuses on statistics about Georgia Democrats. *Ante,* at 489. The Court explains that almost all the districts in the proposed plan with a BVAP above 20% have a likely overall Democratic performance above 50%, and from this the Court concludes that "[t]hese statistics make it more likely as a matter of fact that black voters will constitute an effective voting bloc." *Ibid.* But this is not so. The degree to which the statistics could support any judgment about the effect of black voting in State Senate elections is doubtful, and even on the Court's assumptions the statistics show no clear error by the District Court.

As for doubt about what the numbers have to do with State Senate elections, it is enough to know that the majority's figures are taken from a table describing Democratic voting in statewide, not local, elections. The Court offers no basis for assuming that voting for Democratic candidates in statewide elections correlates with voting behavior in local elections,[7] and in fact, the record points to different, not identical, voting patterns. The District Court specifically noted that the United States's expert testified that "African American candidates consistently received less crossover voting in local election[s] than in statewide elections," 195 F. Supp. 2d, at 71, and the court concluded that there is "compelling evidence that racial voting patterns in State Senate races can be expected to differ from racial voting patterns in statewide races," *id.,* at 85–86.

---

[7] Even if the majority wanted to rely on these figures to make a claim about Democratic voting in statewide elections, the predictors' significance is utterly unclear. The majority pulls its figures from an exhibit titled, "Political Data Report," and a column labeled, "%OVER DEMVOTES," Pl. Exh. 2D. See *ante,* at 489. The document provides no information regarding whether the numbers in the column reflect an average of past performance, a prediction for future performance, or something else altogether.

But even if we assume the data on Democratic voting statewide can tell us something useful about Democratic voting in State Senate districts, the Court's argument does not hold up. It proceeds from the faulty premise that even with a low BVAP, if enough of the district is Democratic, the minority Democrats will necessarily have an effect on which candidates are elected. But if the proportion of nonminority Democrats is high enough, the minority group may well have no impact whatever on which Democratic candidate is selected to run and ultimately elected. In districts, say, with 20% minority voters (all of them Democrats) and 51% nonminority Democrats, the Democratic candidate has no obvious need to take the interests of the minority group into account; if everybody votes (or the proportion of stay-at-homes is constant throughout the electorate) the Democrat can win the general election without minority support. Even in a situation where a Democratic candidate needs a substantial fraction of minority voters to win (say the population is 25% minority and 30% nonminority Democrats), the Democratic candidate may still be able to ignore minority interests if there is such ideological polarization as between the major parties that the Republican candidate is entirely unresponsive to minority interests. In that situation, a minority bloc would presumably still prefer the Democrat, who would not need to adjust any political positions to get the minority vote.

All of this reasoning, of course, carries a whiff of the lamp. I do not know how Georgia's voters will actually behave if the percentage of something is x, or maybe y, any more than the Court does. We are arguing about numerical abstractions, and my sole point is that the Court's abstract arguments do not hold up. Much less do they prove the District Court wrong.

## IV

Section 5, after all, was not enacted to address abstractions. It was enacted "to shift the advantage of time and

inertia from the perpetrators of the evil to its victim," *Beer*, 425 U. S., at 140 (internal quotation marks omitted) (quoting H. R. Rep. No. 94–196, pp. 57–58 (1970)), and the State of Georgia was made subject to the requirement of preclearance because Congress "had reason to suppose" it might "try ... to evade the remedies for voting discrimination" and thus justifies § 5's "uncommon exercise of congressional power." *South Carolina* v. *Katzenbach*, 383 U. S., at 334–335. Section 5 can only be addressed, and the burden to prove no retrogression can only be carried, with evidence of how particular populations of voters will probably act in the circumstances in which they live. The State has the burden to convince on the basis of such evidence. The District Court considered such evidence: it received testimony, decided what it was worth, and concluded as the trier of fact that the State had failed to carry its burden. There was no error, and I respectfully dissent.