**Joan HALL, et al., Plaintiffs,**

v.

**COMMONWEALTH OF VIRGINIA, et al., Defendants.**

**No. CIV.A.2:03 CV 151.**

United States District Court,
E.D. Virginia,
Norfolk Division.

Aug. 7, 2003.

J. Gerald Hebert, Esq., J. Gerald Hebert, P.C., Alexandria, Donald Lee Morgan, Esq., Melissa Marie Johns, Esq., Chandra Walker Holloway, Esq., Tamara Schmidt, Esq., Cleary Gottlieb Steen & Hamilton, Washington, DC, Anita Sue Hodgkiss, Esq., UNC School of Law, Van Hecke–Wettach Hall, Chapel Hill, NC, for Plaintiffs.

Edward Meade Macon, Esq., Assistant Attorney General, Office of the Attorney General, Francis Snead Ferguson, Esq., Paul Michael Thompson, Esq., James Christian Stuchell, Esq., Judith W. Jagdmann, Esq., Richmond, Michael A. Garvin, Esq., Cooper Garvin & Rosenthal, Louis Karl Fisher, Esq., Cody Ryan Smith, Jones Day, Washington, DC, for Defendants.

#### ORDER

MORGAN, District Judge.

This matter comes before the Court on three different motions to dismiss, filed by the Commonwealth of Virginia, et al. (document no. 11), by Virginia Attorney Gener-

al Jerry W. Kilgore (document no. 29), and by Gary Thompson, et al. (document no. 32). The Plaintiffs bring a vote dilution claim under § 2 of the Voting Rights Act of 1965, as amended, *see* 42 U.S.C. § 1973, challenging the recently redrawn boundaries of the Virginia Fourth Congressional District. The motions require the Court to decide whether § 2 of the Act obliges the Commonwealth to adjust the boundaries for the Virginia Fourth Congressional District even though the protected group represented by the Plaintiffs would not constitute a majority in the reconfigured district. The motions are fully briefed.[1] At a hearing conducted on July 22, 2003, the Court took the motions under advisement. Having concluded that § 2 of the Voting Rights Act affords no vote dilution claim in these circumstances, the Court hereby GRANTS each of the three Defendants' motions to dismiss.

### PROCEDURAL AND FACTUAL HISTORY [2]

The Plaintiffs filed this action on February 21, 2003. The action arises out of a redrawing of the boundaries for the Fourth Congressional District that was put in effect in July 2001, when the then Governor, a Republican, signed a new Congressional district plan into law. *See* Complaint ¶ 1. The plan is codified at Va.Code § 24.2–302.1 and will be referred to in this Order as the "2001 Redistricting Plan".

The Plaintiffs are nine black citizens who either reside in the newly drawn Fourth District or who formerly resided in the District but now find themselves outside the District as a result of the boundary change that went into effect in 2001. *See* Complaint ¶¶ 7–14. Defendant Commonwealth of Virginia is headed by the present Governor, a Democrat. Another Defendant, the Secretary of the State Board of Elections, was appointed to her post by the present Governor. *See* Complaint ¶¶ 15–16. Defendant Kilgore and the Thompson, et al., Defendants, entered the case via intervention. *See* Order entered on June 17, 2003 (document no. 28) (Kilgore) & Order entered on July 9, 2003 (document no. 38) (Thompson, et al.).

Because the Commonwealth is subject to § 5 of the Voting Rights Act of 1965, the newly enacted law was submitted to the United States Department of Justice for "preclearance." *See* Complaint ¶ 36. To obtain preclearance under § 5, a covered jurisdiction must establish that its proposed redistricting plan "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." 42 U.S.C. § 1973(c). On October 16, 2001, finding that the Commonwealth had established that the 2001 Redistricting Plan had neither the purpose nor the effect of denying

---

**1.** The briefs on the Commonwealth's motion are document no. 12 (opening brief), document no. 22 (opposition brief), and document no. 24 (rebuttal brief). The briefs on Kilgore's motion are document nos. 12 & 33 (Kilgore adopts the opening briefs filed by the other two Defendants) and document no. 24 (Kilgore and the Commonwealth filed a joint rebuttal brief). The opening brief filed by the other two Defendants were adopted by Kilgore, and the Plaintiffs filed an opposition to both of those briefs. This eliminated the need for the Plaintiffs to file a brief opposing the Kilgore motion (and no such brief was filed). The briefs on Thompson's motion are

document no. 33 (opening brief), document no. 37 (opposition brief), and document no. 40 (rebuttal brief). The Court gave no consideration to the additional rebuttal brief, document no. 35, filed by the Thompson Defendants as it was submitted to the Court in a manner outside of the briefing schedule announced at the hearing conducted on June 23, 2003. *See* Order entered on July 9, 2003 at page 3 (document no. 38).

**2.** The facts recited herein are facts assumed for the purpose of deciding the instant motions to dismiss, and are not factual findings for any other purpose.

or abridging the right to vote because of race, the Department of Justice precleared the redistricting plan. *See* Complaint ¶ 37.

Blacks currently comprise 33.6% of the Fourth District's total population, whereas, in the District as previously drawn, blacks comprised 39.4% of the total population.[3] *See* Complaint ¶ 17. When the District lines were redrawn pursuant to the 2001 Redistricting Plan a number of black residents were shifted out of the Fourth District and into the Third and the Fifth Districts. *See* Complaint ¶ 20. The Third District is a black majority District, where blacks comprise 54% of the total population. *See* Complaint ¶ 26. The Plaintiffs' chief concern is the displacement of blacks out of the Fourth District and into the Third District and Fifth Districts. Because the Third District is a black majority district the Plaintiffs allege that the 2001 Redistricting Plan unnecessarily "packs" blacks into the Third District, *see* Complaint ¶ 39, and dilutes the voting strength of blacks in the Fourth District, *see id.*; *see also* Complaint ¶ 20. Both in the Complaint and at the hearing, Plaintiffs confirmed that their goal is to restore the black total population in the Fourth District to approximately 40%. *See* Complaint ¶ 25; Transcript at page 21, lines 12–14 (document no. 43). The Plaintiffs do not seek to establish a black majority in District Four.[4]

Plaintiffs' Counsel at the hearing suggested that the black total population in the Fourth District can be built up to approximately 40% by redrawing the boundary line that separates the Third and the Fifth Districts from the Fourth District. This would shift blacks out of Third and Fifth Districts, and into the Fourth District. Under this approach, the increase in black representation in the Fourth District comes at the expense of the Third and Fifth Districts. *See* Transcript at page 22, lines 13–17 (document no. 43). The Plaintiffs do not allege that the Third District would remain a black majority district should their plan be adopted. Given the mathematics involved, it appears that adoption of the Plaintiffs' plan would eliminate the black majority that presently exists in the Third District. However, the Court need not make a finding on this issue given the relief sought by the Plaintiffs. Even so, the Plaintiffs argue that elimination of their majority in the Third District is of no concern because a non-majority black population in the Third District would retain the ability to elect the candidate of their choice. *See* Complaint ¶ 26.

## STANDARD OF REVIEW

The function of a motion to dismiss is to test the sufficiency of a complaint; impor-

---

**3.** The Complaint relies on the "black total population" metric instead of "black voting age population". The black voting age population metric is far more useful because it better relates to voting strength. *See Barnett v. Chicago*, 141 F.3d 699, 704 (7th Cir.), *cert. denied*, 524 U.S. 954, 118 S.Ct. 2372, 141 L.Ed.2d 740 (1998); *see also Burton v. Sheheen*, 793 F.Supp. 1329, 1354 (D.S.C.1992) ("political opportunity is best measured in terms of minority voting age population").

**4.** The Plaintiffs, in ¶ 33 of the Complaint, outline the features of three alternative plans that were considered by the Commonwealth. One

of those plans, the Maxwell–Crittenden plan, would, if adopted, have created a black majority in the Fourth District. The Plaintiffs however do not seek implementation of the Maxwell–Crittenden plan. (The Thompson Defendants proffer undisputed public records and, from those records, argue persuasively that it would be impossible to create a black majority in the Fourth District without destroying the black majority in the Third District.) As Plaintiffs' Counsel stated in open court during the hearing, the Plaintiffs' goal is to increase the black population in the Fourth District to approximately 40% and not to create a black majority in that District.

tantly, it does not resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses. *Republican Party of North Carolina v. Martin*, 980 F.2d 943, 952 (4th Cir.1992) (internal citation and quotation marks omitted). In ruling on a Rule 12(b)(6) motion, a Court should keep in mind that as a matter of general course it is a "disfavored motion." *Fayetteville Investors v. Commercial Builders, Inc.*, 936 F.2d 1462 (4th Cir. 1991). A motion to dismiss under Rule 12(b)(6) should not be granted "unless it appears beyond doubt that the plaintiff can prove no facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Martin Marietta Corp. v. International Telecommunications Satellite Org.*, 991 F.2d 94, 97 (4th Cir.1992). During the process of considering a motion to dismiss for failure to state a claim, a court must construe the complaint in the light most favorable to the non-moving party and take that party's allegations as true. *Jenkins v. McKeithen*, 395 U.S. 411, 421–22, 89 S.Ct. 1843, 23 L.Ed.2d 404 (1969); *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). The Court primarily relies on the allegations in the complaint during a 12(b)(6) ruling, but may also consider documents attached to the complaint and incorporated by reference. *Simons v. Montgomery County Police Officers*, 762 F.2d 30, 31–32 (4th Cir.1985). *Simons* documents may be copies of case law, undisputed contracts or public documents, such as those used to establish ownership or proper zoning. *See id.; see also Norfolk Federation of Business Districts v. Department of Housing and Urban Development*, 932 F.Supp. 730, 736–37 (E.D.Va.1996).

### ANALYSIS

The Plaintiffs' contention is that, even though blacks did not constitute a majority in the Fourth District prior to the time when the 2001 Redistricting Plan was implemented, the 5.8% reduction in the total black population in that district brought about by the 2001 Redistricting Plan violates § 2 because it impermissibly dilutes the black vote. The Commonwealth argues that seven of the nine Plaintiffs lack standing. All three Defendants argue that the Plaintiffs fail to state a claim.

### A. Standing

■ The Commonwealth argues that only those Plaintiffs who reside within the Fourth District (as redrawn by the 2001 Redistricting Plan) have standing. *U.S. v. Hays*, 515 U.S. 737, 744–45, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (a racial gerrymander case). The Commonwealth concedes standing as to the two Plaintiffs who reside within the Fourth District. *See* Transcript at page 4, lines 3–4 & page 41, line 25 to page 42, line 1 (document no. 43).

Though not precisely on point, the Court is persuaded by the principle established in *Hays*. The Plaintiffs who reside outside of the Fourth District do not suffer the same type of harm as those who reside within, and such non-resident Plaintiffs therefore assert "only a generalized grievance against governmental conduct of which he or she does not approve." *Hays*, 515 U.S. at 745, 115 S.Ct. 2431. Additionally, the harm asserted by the non-resident Plaintiffs is not necessarily redressed by the relief sought from the Court as those Plaintiffs have no guarantee that they will find themselves back inside the Fourth District should the Plaintiffs prevail on the merits. The Supreme Court has repeatedly found that plaintiffs who reside outside a district lack standing to challenge that district on voting rights grounds. *See Sinkfield v. Kelley*, 531 U.S. 28, 30, 121 S.Ct. 446, 148 L.Ed.2d 329 (2000); *Bush v. Vera*, 517 U.S. 952, 957, 116 S.Ct. 1941, 135 L.Ed.2d 248 (1996); *Hays*, 515 U.S. at 744–745, 115 S.Ct. 2431. Accordingly, the Court finds that Plaintiffs Joan Hall and

Leslie Speight have standing by virtue of their residency within the Fourth District. All other Plaintiffs are DISMISSED FOR LACK OF STANDING.

## B. The Vote Dilution Claim

■ Section 2 of the Voting Rights Act prohibits any "qualification or prerequisite to voting or standard, practice, or procedure ... which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group. 42 U.S.C. § 1973(a). A denial or abridgement of the right to vote in violation of § 2 is established when:

Based on the totality of circumstances, it is shown that the political processes leading to nomination or election ... are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: Provided, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

42 U.S.C. § 1973(b).

As a threshold matter, in order to proceed with a vote dilution claim under § 2 of the Voting Rights Act, members of a protected minority group must establish three "necessary preconditions." *Thorn-* *burg v. Gingles,* 478 U.S. 30, 50–51, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).[5] "First, the minority group must be ... sufficiently large and geographically compact to constitute a majority in a single-member district." *Id.* at 50, 106 S.Ct. 2752. "Second, the minority group must be ... politically cohesive." *Id.* at 51, 106 S.Ct. 2752. And third, the majority must vote "sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate." *Id.* If the Plaintiffs can prove each of these three preconditions, they may then present evidence that, under the "totality of the circumstances" test identified in 42 U.S.C. § 1973(b), there has been impermissible vote dilution. However, "[u]nless these points are established, there neither has been a wrong nor can be a remedy." *Growe v. Emison,* 507 U.S. 25, 40–41, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993). The *Gingles* preconditions thus establish a bright line test that the Plaintiffs must satisfy before the Court may reach the merits of their vote dilution claim. *See, e.g., Valdespino v. Alamo Heights Indep. School Dist.,* 168 F.3d 848, 852 (5th Cir. 1999), *cert. denied,* 528 U.S. 1114, 120 S.Ct. 931, 145 L.Ed.2d 811 (2000). The three *Gingles* factors do not alone necessarily establish a § 2 violation, but if Plaintiffs cannot establish the preconditions, they cannot establish a § 2 claim. *Uno v. City of Holyoke,* 72 F.3d 973, 988 (1st Cir.1995) ("In any claim brought under ... § 2, the *Gingles* preconditions are central to the plaintiffs' success.").

Of particular importance in the instant case is the first *Gingles* precondition; that is, the requirement that the minority group demonstrate that its population is sufficiently large and geographically com-

---

5. While the *Gingles* Court construed § 2 in the context of a challenge to a multi-member district, 478 U.S. at 50, 106 S.Ct. 2752, it is nevertheless clear that the preconditions apply with equal force to challenges to single- member districts, such as the Fourth Congressional District. *Growe v. Emison,* 507 U.S. 25, 40, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993).

pact to constitute a majority in a single-member district. The reason for this requirement is clear: "Unless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Gingles,* 478 U.S. at 50 n. 17, 106 S.Ct. 2752 (emphasis in original); *see also Growe,* 507 U.S. at 40, 113 S.Ct. 1075 (The first precondition is "needed to establish that the minority has the potential to elect a representative of its own choice in some single-member district.").

The Supreme Court has explained this first precondition as follows: "When applied to a claim that single-member districts dilute minority votes, the first *Gingles* condition requires the possibility of creating *more than the existing number* of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Johnson v. De Grandy,* 512 U.S. 997, 1008, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (emphasis added). Thus, a § 2 plaintiff must demonstrate that it is possible to create additional geographically compact majority-minority districts.

The instant Plaintiffs cannot satisfy the first *Gingles* precondition because the re-

lief they seek will fail to create an additional geographically compact majority black district in the Fourth Congressional District. Instead, the Plaintiffs' plan restores the black population in the Fourth District to its pre–2001 Redistricting Plan level without creating a majority therein. This falls short of what is required by the *Gingles* first precondition.

Plaintiffs rely on footnote 12 in the *Gingles* opinion (pertaining to so-called "influence districts"), several out-of-circuit district court opinions, and various law review articles to argue that they can proceed with their vote dilution claim even though their remedy sought for the Fourth District would not create a majority black population. They contend that an increase in black representation in the Fourth District to approximately the 40% level will enable blacks to combine with white crossover voters [6] to elect the minority's candidate of choice. The Plaintiffs argue that the first *Gingles* precondition requires nothing more. Plaintiffs' Counsel at oral argument referred to a non-majority district where blacks with help of white crossover votes can elect the black candidate of choice as a "coalition district," [7] a "performance district," [8] or an "ability to elect district." [9] The Plaintiffs attempt to distinguish the foregoing three forms of dis-

---

**6.** The term "crossover voters" has been defined as voters from outside the protected group who cast their votes for the protected group's candidate of choice. *See, e.g., Johnson v. De Grandy,* 512 U.S. 997, 1008, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994). The term would presumably apply also to voters from inside the protected group who cast their votes for another group's candidate of choice.

**7.** The U.S. Supreme Court has described a coalition district as one where "minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice." *Georgia v. Ashcroft,* — U.S. —,

—, 123 S.Ct. 2498, 2512, 156 L.Ed.2d 428 (2003).

**8.** This term is apparently borrowed from *Martinez v. Bush,* 234 F.Supp.2d 1275 (S.D.Fla. 2002). The Court there held that the first *Gingles* precondition, which requires that the protected group "constitute a majority", should not be construed as a literal, mathematical requirement. Instead, the Court in *Martinez* held that the first *Gingles* precondition is satisfied so long as the district will "perform" for the protected group. *Id.* at 1321 n. 56.

**9.** Plaintiffs cite *Armour v. Ohio,* 775 F.Supp. 1044, 1059 n. 19 (N.D.Ohio 1991) for the "ability to elect" nomenclature and for the distinction between an "ability to elect" dis-

tricts from an "influence district,"[10] which they suggest is one where the non-majority black vote is large enough to influence the selection of candidates but too small to elect the black candidate of choice. *See* Plaintiffs' brief opposing the Commonwealth's motion to dismiss at 11 (document no. 22).

The Defendants acknowledge that the Supreme Court in *Gingles* left open the question of whether a vote dilution could be brought in an "influence district." They argue that no such cause of action should exist in an "influence district" because every Federal Circuit Court that has considered the question has refused to recognize such claims and because policy concerns militate against the recognition of such claims. However, the Plaintiffs argue their vote dilution claim is based upon

something other than an "influence district," and argue that different standards should be applied to a "coalition district," a "performance district," or an "ability to elect district."

Plaintiffs argue a "coalition district," "performance district" and an "ability to elect district" are districts where the protected group is able to elect its candidate of choice provided that the protected group supplements its own vote with crossover votes from another group or groups. The Plaintiffs allege that the Fourth District is such a district. The Court, therefore, must decide whether § 2 of the Voting Rights Act creates a vote dilution claim for districts of this type. Neither the U.S. Supreme Court, the Fourth Circuit,[11] nor any District Court within the Fourth Circuit[12] has passed on the viability of vote

---

trict and an "influence" district. *See* Plaintiffs' brief opposing the Commonwealth's motion to dismiss at 11 (document no. 22). In an "ability to elect" district, according to *Armour*, the minority group has the ability to elect a candidate of its choice irrespective of whether the minority group constitutes a majority of the voting population in the district.

**10.** The U.S. Supreme Court has described an influence district as one "where black voters would be able to exert a significant—if not decisive—force in the election process." *Georgia v. Ashcroft*, —— U.S. at ——, 123 S.Ct. at 2498, 156 L.Ed.2d 428 (2003). Stated another way, an influence district is one "in which a minority group has enough political heft to exert significant influence on the choice of candidate though not enough to determine that choice." *Barnett v. Chicago*, 141 F.3d 699, 703 (7th Cir.), *cert. denied*, 524 U.S. 954, 118 S.Ct. 2372, 141 L.Ed.2d 740 (1998).

**11.** In the vote dilution case of *Collins v. Norfolk*, 883 F.2d 1232 (4th Cir.1989), *cert. denied*, 498 U.S. 938, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990), the Fourth Circuit recognized the necessity for the protected group to prove it constituted a majority. The issue of "influence" or "coalition" districts was not addressed. *See also Cane v. Worcester County*, 35 F.3d 921, 925–26 (4th Cir.1994) (same),

*cert. denied*, 513 U.S. 1148, 115 S.Ct. 1097, 130 L.Ed.2d 1065 (1995); *Smith v. Brunswick County*, 984 F.2d 1393, 1400–02 (4th Cir. 1993) (same); *McGhee v. Granville County*, 860 F.2d 110, 119 (4th Cir.1988) (noting that the *Gingles* preconditions preclude "some small and unconcentrated minority groups" from bringing a vote dilution claim—the issue of "influence" or "coalition" districts was not addressed).

**12.** Neither the briefs submitted by the parties nor the Court's own research disclose any District Court opinions within the Fourth Circuit that address the issue of "influence" or "coalition" districts. *See Colleton County Council v. McConnell*, 201 F.Supp.2d 618, 642 (D.S.C.2002) (Court recognizes the necessity for the protected group to prove it constituted a majority; the issue of "influence" or "coalition" districts was not addressed); *Marylanders for Fair Representation v. Schaefer*, 849 F.Supp. 1022, 1051–52 (D.Md.1994) (Court rejects argument that the *Gingles* first precondition requires the protected group to show that it constitutes *more* than a majority); *NAACP v. City of Columbia*, 850 F.Supp. 404, 413 (D.S.C.1993) (Court recognizes the necessity for the protected group to prove it constituted a majority; the issue of "influence" or "coalition" districts was not addressed); *Burton v. Sheheen*, 793 F.Supp. 1329, 1354

dilution claims in a "coalition district," "performance district" or an "ability to elect district." It thus appears to be an issue of first impression within this Circuit.

The starting point in the analysis is to recognize that the Supreme Court confirmed that a vote dilution claim will survive the first *Gingles* precondition when the protected group postulates majority status for itself in a geographically compact redrawn district. The *Gingles* Court, however, did not rule on whether the converse is true. That is, the Supreme Court did not hold that vote a dilution claim could never be brought unless the protected group could constitute a majority. By inserting footnote 12 into the opinion the Supreme Court left open the question of whether a vote dilution claim could be brought with respect to an "influence district":

> We have no occasion to consider whether § 2 permits, and if it does, what standards should pertain to, a claim brought by a minority group, that is not sufficiently large and compact to constitute a majority in a single-member district, alleging that the use of a multi-member district impairs its ability to influence elections.

*Gingles*, 478 U.S. at 46 n. 12, 106 S.Ct. 2752; *see also Growe v. Emison*, 507 U.S. 25, 41 n. 5, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) (same); *Voinovich v. Quilter*, 507 U.S. 146, 155, 113 S.Ct. 1149, 122 L.Ed.2d 500 (1993) (same); *Johnson v. De Grandy*, 512 U.S. 997, 1008–09, 114 S.Ct. 2647, 129 L.Ed.2d 775 (1994) (same).

Although the U.S. Supreme Court has left the door open to vote dilution claims in an "influence" district, the five Circuit Courts of Appeal which have considered the issue have uniformly rejected all such claims.[13] For instance, the Sixth Circuit in *Cousin v. Sundquist*, 145 F.3d 818 (6th Cir.1998), *cert. denied*, 525 U.S. 1138, 119 S.Ct. 1026, 143 L.Ed.2d 37 (1999), rejected the claim that the Voting Rights Act compelled the creation of a single-member district with a thirty-four percent black voting-age population. 145 F.3d at 827. The Sixth Circuit held:

> We find the plaintiffs' [claim] ... particularly lacking because it is based on the premise that the Section 2 violation in this case consists of an impairment of the minority's ability to *influence* the outcome of the election, rather than to *determine* it.... [W]e would reverse any decision to allow such a claim to proceed since we do not feel that an "influence" claim is permitted under the Voting Rights Act.

*Id.* at 828–29 (emphasis in original).[14] In another case, the Sixth Circuit, sitting *en banc*, confirmed that where a single minority group cannot comprise the majority of a proposed district's voting-age population, minorities have no valid Section 2 objection to a redistricting plan. *Nixon v. Kent County*, 76 F.3d 1381, 1394 (6th Cir.1996); *contra, Campos v. Baytown*, 840 F.2d

(D.S.C.1992) (Court holds that the *Gingles* first precondition is satisfied "if the percentage of the black voting age population is greater than 50 percent"; the issue of "influence" or "coalition" districts was not addressed).

**13.** Though five Circuit Courts of Appeal have rejected vote dilution claims in "influence" districts, the First Circuit has suggested that such claims may eventually be recognized. *See Uno v. City of Holyoke*, 72 F.3d 973, 979

n. 2 (1st Cir.1995) (the first *Gingles* "precondition will have to be reconfigured to the extent that the courts eventually validate so-called influence dilution claims").

**14.** Plaintiffs' Counsel, in scholarly writings he authored, candidly acknowledges that "[m]ost courts ... reject[ ] the contention that minority groups can demand districts in which they do not constitute some kind of majority." Hebert, *Redistricting in the Post–2000 Era*, 8 GEO. MASON L. REV. 431, 440 (2000).

1240, 1244 (5th Cir.1988) (aggregating blacks and hispanics into a majority satisfies the first *Gingles* precondition, even though neither group by itself can rightly claim majority status), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989). The Sixth Circuit explained that, to elect representatives of their choice, members of such a group would, by definition, be required to form political coalitions with members of one or more other groups. *Nixon,* 76 F.3d at 1392. Requiring districts amenable to such bi-racial coalitions would transform "the Voting Rights Act from a statute that levels the playing field for all races to one that forcibly advances contrived interest-group coalitions of racial or ethnic minorities." *Id.* (quoting *League of United Latin Am. Citizens v. Clements,* 999 F.2d 831, 894 (5th Cir.1993) (en banc) (Jones, J., concurring)).

Similarly, the Seventh Circuit rejected a § 2 claim that a district must be created with black voting-age populations between forty-three and forty-four percent: "[W]e cannot consider claims that … districts merely impair plaintiffs' ability to influence elections. Plaintiffs' ability to win elections must also be impaired." *McNeil v. Springfield Park Dist.,* 851 F.2d 937, 947 (7th Cir.1988), *cert. denied,* 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989). And the Fifth Circuit, holding that vote dilution claimants are "required … to prove that their minority group exceeds 50% of the relevant population in [a potential] district," affirmed a judgment against plaintiffs after finding that Hispanics could at most make up only 48.3 percent of a district's voting-age citizen population. *Valdespino v. Alamo Heights Indep. School Dist.,* 168 F.3d 848, 852–53 (5th Cir.1999), *cert. denied,* 528 U.S. 1114, 120 S.Ct. 931, 145 L.Ed.2d 811 (2000); *accord,*

*Negron v. City of Miami Beach,* 113 F.3d 1563, 1569 (11th Cir.1997) (holding that § 2 vote dilution claim cannot succeed when a protected group fails to comprise a majority of the citizen voting-age population); *Romero v. City of Pomona,* 883 F.2d 1418, 1424 n. 7 (9th Cir.1989) ("We are aware of no successful section 2 voting rights claim ever made without a showing that the minority group was capable of a majority vote in a designated single district."), *overruled on other grounds, Townsend v. Holman Consulting,* 914 F.2d 1136 (9th Cir.1990).

The Plaintiffs argue that they do not seek the creation of an "influence district" in the Fourth Congressional District. The Plaintiffs instead argue for a "coalition district" [15] which, they contend, is analytically distinct. There is some support for their position in *Georgia v. Ashcroft,* —— U.S. ——, 123 S.Ct. 2498, 156 L.Ed.2d 428 (2003), where the Supreme Court defined a "coalition district," albeit in dicta, as a district where the protected group wields more power than would be the case in an "influence district." The question, then, is whether the disfavor that has befallen vote dilution claims in "influence districts" likewise precludes such claims with respect to "coalition districts." The Court FINDS that it does.

Simply assessing whether a certain minority percentage will affect an electoral outcome would require courts to make, as then-Judge Stephen Breyer aptly noted in rejecting such a claim, "the very finest of political judgments about possibilities and effects—judgments well beyond their capacities." *Latino Political Action Comm. v. City of Boston,* 784 F.2d 409, 412 (1st Cir.1986). Members of any protected minority group could always launch a lawsuit

---

**15.** The Plaintiffs also denominate the Fourth District as a "performance district" or an "ability to elect district." The Court FINDS that these terms are interchangeable and have equivalent meaning as well as legal effect (*see* definitions of these terms *supra* in notes 7–9).

to increase their presence in a district from 15 percent to 20 percent, or from 20 percent to 25 percent, and argue that this increase will cause their candidate to prevail. As the Seventh Circuit put it, "[c]ourts might be flooded by the most marginal section 2 claims if plaintiffs had to show only that an electoral practice or procedure weakened their ability to influence elections." *McNeil*, 851 F.2d at 947; *see also McGhee v. Granville County*, 860 F.2d 110, 116 (4th Cir.1988) (citing *McNeil* for proposition that first *Gingles* precondition is necessary to prevent vote dilution concept from being "an open-ended one subject to no principled means of application"); *Burton v. Sheheen*, 793 F.Supp. 1329, 1350 (D.S.C.1992) (the *Gingles* preconditions shield "the courts from meritless claims"). "Nothing but raw intuition could be drawn upon by courts to determine in the first place the size of those smaller aggregations having sufficient group voting strength to be capable of [vote] dilution in any legally meaningful sense and, beyond that, to give some substantive content other than raw-power-to-elect to the concept as applied to such aggregations." *Gingles v. Edmisten*, 590 F.Supp. 345, 381 (E.D.N.C.1984), *aff'd in part, rev'd in part, Thornburg v. Gingles*, 478 U.S. 30, 106 S.Ct. 2752, 92 L.Ed.2d 25 (1986).[16]

This point is aptly illustrated here, where Plaintiffs allege that a 34 percent black population in the Fourth District denies black voters their basic voting rights but an "approximately 40%" black population would guarantee those rights. *See* Complaint ¶ 25. Thus, the Court will be required to find that this six percent differential is of critical significance, because white crossover voting is enough to elect a black-preferred candidate at 40 percent, but plainly insufficient at 34 percent.[17]

The Plaintiffs' proposal could jeopardize the ability of black voters to elect their candidate of choice in the Third District. Thus, under Plaintiffs' view, Section 2 should be interpreted to threaten Virginia's first majority black district in order to increase the Fourth District's black population to 40 percent. In other words, Plaintiffs argue § 2 mandates the creation of two minority black districts where black voters in each are dependent upon white crossover voting to elect their preferred candidates. In paragraph 26 of their Complaint Plaintiffs postulate that in the Third District, which is currently represented by a popular incumbent who was the black candidate of choice, the incumbent could win reelection even if the 54% black population in that district were significantly reduced. The uncertainty inher-

**16.** *See also Metts v. Almond*, 217 F.Supp.2d 252, 258 (D.R.I.2002) (observing that there would be no "ascertainable and objective standard for adjudicating [influence] claims" because it would be "virtually impossible to reliably calculate the number of minority voters that would be required in order to 'influence' election results"); *Illinois Legislative Redistricting Comm'n v. LaPaille*, 786 F.Supp. 704, 715 (N.D.Ill.) ("The requirement that a minority group be large enough to control a district, not just 'influence' it, enables the courts to adjudicate Voting Rights claims with a reasonable amount of efficiency and consistency."), *aff'd*, 506 U.S. 948, 113 S.Ct. 399, 121 L.Ed.2d 325 (1992); *Hastert v. State Bd.*

*of Elections*, 777 F.Supp. 634, 654 (N.D.Ill. 1991) (three-judge court) (Once the *Gingles* majority "threshold is breached, there appears to be no logical or objective measure for establishing a threshold minority group size necessary for bringing an influence claim under § 2.").

**17.** Arguably, the "enhanced" opportunity requested by Plaintiffs in the Fourth District could only be attained by shifting black voters out of the adjoining majority black Third Congressional District (if the Plaintiffs are to keep faith with the "compactness" requirement of the first *Gingles* precondition).

ent in such forecasts illustrates the danger of courts speculating in "the very finest of political judgments." *Latino Political Action Comm., Inc. v. City of Boston,* 784 F.2d 409, 412 (1st Cir.1986). Federal Circuit Courts of Appeal which have considered the issue have uniformly rejected such a speculative and intrusive judicial role in enforcing the Voting Rights Act.

The Court is also mindful "that the Constitution leaves with the States primary responsibility for apportionment of their federal congressional ... districts." *Growe v. Emison,* 507 U.S. 25, 34, 113 S.Ct. 1075, 122 L.Ed.2d 388 (1993) (citing U.S. CONST., Art. I, § 2). Though this Court should not shrink from its duty to act when a violation of federal law is afoot, it is reluctant to expand the interpretation of Voting Rights Act § 2 where, as here, the result "represents a significant intrusion into the rights of states and their subdivisions to manage local governance as they will." *Nixon v. Kent County,* 76 F.3d 1381, 1390 (6th Cir.1996) ("Although the aims of the Voting Rights Act are laudable, this delicate balance provides additional evidence that the words of the 1982 amendment were chosen with particular care and courts should be cautious in construing them.").

### SUMMARY

The Plaintiffs correctly point out that the Supreme Court in *Gingles, Growe, Voinovich,* and *Johnson,* left open the issue of whether a vote dilution claim could be brought in an "influence district." It is reasonable to conclude that the issue remains similarly open on the question of whether a vote dilution claim may be brought in a "coalition district," since the Supreme Court has not addressed that particular question. All five Circuit Courts of Appeal that have considered the question of an "influence district" have held that the first precondition in *Gingles* establishes a bright line that precludes vote dilution claims in other than so called majority-minority districts. Two District Courts, however, have stepped across that bright line, and held that a vote dilution claim may be brought in a district where the protected group will not constitute a majority.[18] Neither the U.S. Court of Appeals for the Fourth Circuit nor any District Court in this Circuit have spoken to the issue of "coalition districts" or "influence districts," and the Plaintiffs have presented no argument which persuades this Court to deviate from what is clearly the majority rule. Further, as the Federal Circuit Courts have observed, Federal Courts ought to avoid intrusive speculation on political matters of the type presented here. The Plaintiffs ask this Court to create a rule that would substitute the Federal Courts' subjective estimate of minority voter influence in an "influence" or "coalition" district for the well established and objective rule requiring a majority-minority district. The Court will adhere to existing precedent set by the five Circuit Courts of Appeal and GRANT the Defendants' motions to dismiss.

The Clerk is REQUESTED to send a copy of this Order to all counsel of record.

It is so ORDERED.

---

**18.** *See Martinez v. Bush,* 234 F.Supp.2d 1275, 1321 n. 56 (S.D.Fla.2002); *Armour v. Ohio,* 775 F.Supp. 1044, 1050–52 (N.D.Ohio 1991) (it should be noted that *Armour's* interpretation of the first *Gingles* precondition pre-dat-

ed the Sixth Circuit's decision in *Cousin v. Sundquist,* 145 F.3d 818 (6th Cir.1998), *cert. denied,* 525 U.S. 1138, 119 S.Ct. 1026, 143 L.Ed.2d 37 (1999)).