PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

JOAN HALL; RICHARD PRUITT;
THOMASINA PRUITT; VIVIAN CURRY;
EUNICE MCMILLAN; JAMES SPELLER;
ROBBIE GARNES; LESLIE SPEIGHT,
                    *Plaintiffs-Appellants,*

            and

ELIJAH SHARPE,

                              *Plaintiff,*

        v.

COMMONWEALTH OF VIRGINIA; JEAN
JENSEN, Secretary, State Board of
Elections, in her official capacity;
JERRY W. KILGORE, in his official
capacity as Attorney General of the
Commonwealth of Virginia; GARY
THOMPSON; CHARLES BROWN; JAMES
BROWN; JAMES ALFRED CAREY;
EVELYN CHANDLER; CLIFTON E.
HAYES, JR.; QUENTIN E. HICKS; IRENE
HURST; WAYNE OSMORE,
                    *Defendants-Appellees.*

No. 03-2113

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Henry Coke Morgan, Jr., District Judge.
(CA-03-151)

Argued: May 4, 2004

Decided: September 22, 2004

Before NIEMEYER, SHEDD, and DUNCAN, Circuit Judges.

Affirmed by published opinion. Judge Duncan wrote the opinion, in which Judge Niemeyer and Judge Shedd joined.

---

**COUNSEL**

**ARGUED:** J. Gerald Hebert, Alexandria, Virginia, for Appellants. Michael A. Carvin, JONES DAY, Washington, D.C.; Edward Meade Macon, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VIRGINIA, Richmond, Virginia, for Appellees. **ON BRIEF:** Donald L. Morgan, CLEARY, GOTTLIEB, STEEN & HAMILTON, Washington, D.C.; Anita S. Earls, UNC-CENTER FOR CIVIL RIGHTS, Chapel Hill, North Carolina, for Appellants. Jerry W. Kilgore, Attorney General of Virginia, Judith Williams Jagdmann, Deputy Attorney General, James C. Stuchell, Assistant Attorney General, Richmond, Virginia; Louis K. Fisher, Shay Dvoretzky, Cody R. Smith, JONES DAY, Washington, D.C., for Appellees.

---

**OPINION**

DUNCAN, Circuit Judge:

At issue in this lawsuit under Section 2 of the Voting Rights Act of 1965, 79 Stat. 439 (codified as amended at 42 U.S.C. § 1973 (2003)), is whether minority plaintiffs, who are not sufficiently numerous to form a voting majority in any single-member district in the Commonwealth of Virginia, may nevertheless claim that a legislative redistricting plan denies minority voters an equal opportunity to elect candidates of their choice. The district court dismissed the complaint on the grounds that the plaintiffs could not satisfy the requirement established in *Thornburg v. Gingles* that a minority group seeking relief under Section 2 "demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district." 478 U.S. 30, 50 (1986). Because we agree that *Gingles* establishes a numerical majority requirement for all Section 2 claims, we affirm the order of the district court dismissing the complaint with prejudice.

I.

On June 19, 2001, the Commonwealth held a special election for the United States House of Representatives seat in the Fourth Congressional District. The seat had become vacant on account of the death of longtime Democratic Representative Norman Sisisky on March 29, 2001. In the special election, Republican Randy Forbes defeated Democrat Louise Lucas to capture the Fourth District seat by a 52 to 48 percent margin.

Shortly thereafter, on July 10, 2001, the Virginia General Assembly enacted the existing congressional district plan (the "2001 Redistricting Plan") based on the results of the 2000 census.[1] Relevant to this appeal, the 2001 Redistricting Plan redrew the boundaries of the Fourth District, shifting a number of black[2] citizens out of the Fourth District and into the Third and Fifth Congressional Districts. Before the enactment of the 2001 Redistricting Plan, blacks formed 39.4 percent of the total population and 37.8 percent of the voting-age population in the Fourth District.[3] In the reconfigured Fourth District, blacks constitute 33.6 percent of the total population and 32.3 percent of its voting-age population.

---

[1]The 2001 Redistricting Plan was duly signed into law by the Governor of Virginia and is codified at Va. Code Ann. § 24.2-302.1 (Michie 2004). The Department of Justice precleared the enacted plan pursuant to Section 5 of the Voting Rights Act, which requires a showing that the plan "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color . . . ." 42 U.S.C. § 1973c.

[2]For the purposes of this opinion, we use the terms "minority" and "black" interchangeably.

[3]The complaint provides only the total population statistics for the relevant congressional districts. Voting-age population statistics, however, are publicly available on the official redistricting website of the Virginia Division of Legislative Services. We may properly take judicial notice of this information in reviewing the dismissal of the complaint under Rule 12(b)(6) of the Federal Rules of Civil Procedure. *See Papasan v. Allain*, 478 U.S. 265, 268 n.1 (1986) ("Although this case comes to us on a motion to dismiss under Federal Rule of Civil Procedure 12(b), we are not precluded in our review of the complaint from taking notice of items in the public record . . . .").

The 2001 Redistricting Plan left the total population and voting-age population figures for blacks in the Third District virtually unchanged. The Third District previously had a total black population of 57 percent and a black voting-age population of 53.3 percent. Under the new plan, blacks in the Third District comprise 56.8 percent of the total population and 53.2 percent of the voting-age population. Similarly, the total population and voting-age population statistics for blacks in the Fifth District were largely unaffected by the 2001 Redistricting Plan. Blacks constituted 24.3 percent of the total population in the Fifth District both before and after the enactment of the plan. Black voting-age population, however, saw a slight increase from 22.7 percent in the former Fifth District, to 22.8 percent in the redrawn Fifth District.[4]

The plaintiffs are nine registered voters who either currently reside in the Fourth District or were shifted out of the Fourth District as a result of the 2001 Redistricting Plan. On February 21, 2003, the plaintiffs filed a federal complaint in the Eastern District of Virginia alleging that the reconfiguration of the Fourth District dilutes minority voting strength in violation of Section 2 of the Voting Rights Act.[5]

---

[4]No explanation appears on the face of the record as to why the 2001 Redistricting Plan did not result in greater population changes in the Third and Fifth Districts.

[5]Section 2 of the Voting Rights Act, 42 U.S.C. § 1973, provides that:

(a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 1973b(f)(2) of this title, as provided in subsection (b) of this section.

(b) A violation of subsection (a) of this section is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which

More precisely, the complaint alleges that, in the former Fourth District, blacks were sufficiently numerous to combine with white voters and thereby elect their preferred candidates to public office. The plaintiffs contend that, in the newly-drawn Fourth District, blacks are too small in number to form the same winning coalition with "crossover"[6] white voters that existed before the enactment of the 2001 Redistricting Plan. The complaint further alleges that the new plan dilutes minority voting strength in the Fourth District by shifting black voters out of the Fourth and into the Third District. According to the plaintiffs, the reassignment of black voters to this already safe majority-minority district[7] amounts to an unnecessary waste of black votes. As affirmative relief, the plaintiffs requested an order: (1) declaring that the 2001 Redistricting Plan dilutes minority voting strength in violation of Section 2; (2) enjoining the defendants from conducting any elections in the Fourth District under the 2001 Redistricting Plan; and (3) restoring the Fourth District to approximately 40 percent in total black population.

Relying on the Supreme Court's decision in *United States v. Hays*, 515 U.S. 737 (1995), the district court dismissed for lack of standing the seven plaintiffs who no longer reside in the Fourth District as a result of the 2001 Redistricting Plan. The *Hays* Court held that plaintiffs who do not live in a challenged district lack standing to claim that the district has been racially gerrymandered in violation of the Fourteenth Amendment. *Id.* at 744-45 ("Where a plaintiff resides in a racially gerrymandered district . . . the plaintiff has been denied equal treatment . . . and therefore has standing to challenge the legis-

---

members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided*, That nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

[6]"Crossover" voters are persons outside a minority group who support the minority group's candidate in an election. *See Gingles*, 478 U.S. at 56.

[7]A majority-minority district is a legislative district "in which a majority of the population is a member of a specific minority group." *Voinovich v. Quilter*, 507 U.S. 146, 149 (1993).

lature's action."). Although *Hays* concerned a racial gerrymandering claim under the Equal Protection Clause, rather than a vote dilution claim under Section 2 of the Voting Rights Act, the district court was persuaded that the principles of standing discussed in *Hays* apply equally to the seven plaintiffs in this case who do not live in the challenged district, and thus can claim no more than a "'generalized grievance against governmental conduct of which [they] do[ ] not approve.'" *Hall v. Commonwealth of Va.*, 276 F. Supp. 2d 528, 531 (E.D. Va. 2003) (quoting *Hays*, 515 U.S. at 745). Accordingly, the district court held that only Plaintiffs Joan Hall and Leslie Speight have standing to challenge the newly-drawn Fourth District "by virtue of their residency within the Fourth District." *Id.* at 531-32.

The district court ultimately dismissed the vote dilution claims of Hall and Speight on the grounds that they failed to satisfy all of the "necessary preconditions" for a Section 2 claim established by the Supreme Court in *Thornburg v. Gingles*, 478 U.S. 30 (1986). The *Gingles* Court construed Section 2 in the context of a lawsuit claiming that the election of candidates from a multimember district[8] diluted minority voting strength by submerging a cohesive racial minority group within a bloc-voting white majority. The Court held that plaintiffs challenging the use of multimember districts under Section 2 must first establish three threshold conditions. The minority group must be able to (1) "demonstrate that it is sufficiently large and compact to constitute a majority in a single member district," (2) "show that it is politically cohesive," and (3) "demonstrate that the white

---

[8]Vote dilution challenges to legislative districts can arise either in the case of "single-member" or "multimember" districts. The single-member district "is the smallest political unit from which representatives are elected." *Gingles*, 478 U.S. at 50 n.17. In these districts, one candidate is elected to represent voters in the district. By contrast, in multimember districts, "two or more legislators [are] elected at large by the voters of the district." *Whitcomb v. Chavis*, 403 U.S. 124, 127-28 (1971). Because of the greater size of multimember districts, a minority group "may be unable to elect any representatives in an at-large election, yet may be able to elect several representatives if the political unit is divided into single-member districts." *Rogers v. Lodge*, 458 U.S. 613, 616 (1982).

majority votes sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate." *Id.* at 50-51.[9]

Proof of the *Gingles* preconditions is not alone sufficient to establish a claim of vote dilution under Section 2. "The ultimate determination of vote dilution under the Voting Rights Act still must be made on the basis of the 'totality of the circumstances.'" *Lewis v. Alamance County*, 99 F.3d 600, 604 (4th Cir. 1996) (internal quotations omitted). On the other hand, the failure of a minority group to satisfy all of the *Gingles* preconditions means that it cannot sustain a claim under Section 2 that the challenged electoral practice "impede[s] the ability of minority voters to elect representatives of their choice." *Gingles*, 478 U.S. at 48. After analyzing the vote dilution allegations in the complaint, the district court held that Hall and Speight failed to state a claim cognizable under Section 2, since blacks would not form a population or voting-age majority in the Fourth District even if they prevailed and the Fourth District was restored to approximately 40 percent in total black population. The district court therefore dismissed the complaint with prejudice pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

On appeal, the plaintiffs claim that the district court erred in treating the first *Gingles* precondition as "a bright-line numerical cut-off requiring black voters to be a numerical majority in a single-member district." Appellants' Br. at 8. Although *Gingles* states very clearly that Section 2 plaintiffs must demonstrate that a minority group is large enough to form "a majority" in a district, *Gingles*, 478 U.S. at 50, the plaintiffs argue that nothing in the language of Section 2 or *Gingles* requires that a minority group constitute a *numerical* majority in a district in order to state a vote dilution claim. Instead, the plaintiffs contend that the first *Gingles* precondition is satisfied not only when a minority group constitutes a numerical majority in a single-member district, but also when minorities are sufficiently numerous to form an "effective" or "functional" majority in a single-member

---

[9]The *Gingles* preconditions are equally applicable in vote dilution challenges to single-member legislative districts. *See Johnson v. De Grandy*, 512 U.S. 997, 1006 (1994) (applying *Gingles* preconditions in a single-member district dilution suit); *see also Growe v. Emison*, 507 U.S. 25, 40 (1993) (same).

district by combining with voters from other racial or ethnic groups. Appellants' Br. at 28. According to the plaintiffs, the purpose of Section 2 is to remove obstacles that impair the ability of minorities to elect their preferred candidates. Thus, they argue that if minorities can elect a candidate by forming a majority in a single-member district in combination with voters from another racial group, "then they have demonstrated that a structure which prevents them from doing so is dilutive." *Id.* at 22. Fundamentally, the plaintiffs contend that Section 2 authorizes a claim that an election law or practice dilutes the voting strength of a multiracial coalition.

## II.

We review de novo the dismissal of a complaint under Rule 12(b)(6), *Franks v. Ross*, 313 F.3d 184, 192 (4th Cir. 2002), which authorizes the dismissal of a complaint that "fail[s] to state a claim upon which relief can be granted," Fed. R. Civ. P. 12(b)(6). Because the purpose of Rule 12(b)(6) is to test the legal sufficiency of a complaint, rather than the facts alleged in support of it, we "must accept as true all well-pleaded allegations and must construe the factual allegations in the light most favorable to the plaintiff." *Randall v. United States*, 30 F.3d 518, 522 (4th Cir. 1994). Ultimately, a complaint should not be dismissed under Rule 12(b)(6) "unless it appears certain that the plaintiff can prove no set of facts which would support its claim and would entitle it to relief." *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). With these principles in mind, we consider whether the complaint states a valid claim under Section 2.[10] However, before turning to the merits of the plaintiffs' appeal, we set forth below the concepts that give meaning to a vote dilution claim, as well as the standards that keep it "within principled legal bounds." *McGhee v. Granville County*, 860 F.2d 110, 116 (4th Cir. 1988).

---

[10]We decline to address the arguments concerning whether the district court erred in dismissing seven of the nine plaintiffs for lack of standing. The question of standing in this appeal is purely academic. Two of the named plaintiffs are both current and former residents of the Fourth District and, therefore, unquestionably have standing to claim that the Fourth District dilutes minority voting strength in violation of Section 2.

III.

A.

A vote "dilution" claim alleges that a particular practice operates "to cancel out or minimize the voting strength" of a minority group. *White v. Regester*, 412 U.S. 755, 765 (1973). In turn, a minority group's "voting strength" is measured in terms of its ability to elect candidates to public office. *Gingles*, 478 U.S. at 88 (O'Connor, J., concurring) (observing that "minority voting strength is to be assessed solely in terms of the minority group's ability to elect candidates it prefers") (emphasis omitted)). In choosing the ability "to elect" its preferred candidates as the measure of a minority group's voting strength, the Court declined to address whether Section 2 permits claims, brought by a minority group too small to form a majority in a single-member district, that a practice "impairs its ability *to influence* [rather than to win] elections."[11] *Id.* at 46 n.12. Thus, under existing Supreme Court authority, a vote dilution claim under Section 2 must be cast solely in terms of an allegation that a particular practice "impede[s] the ability of minority voters to elect representatives of their choice." *Id.* at 48.

Any claim that the voting strength of a minority group has been "diluted" must be measured against some reasonable benchmark of "undiluted" minority voting strength. As Justice Frankfurter once observed, "[t]alk of 'debasement' or 'dilution' is circular talk. One cannot speak of 'debasement' or 'dilution' of the value of a vote until

---

[11]The Supreme Court has repeatedly declined to rule on the viability of "influence" dilution claims. *See De Grandy*, 512 U.S. at 1008-09; *Voinovich*, 507 U.S. at 154 (1993); *Growe*, 507 U.S. at 41 n.5. An "influence" claim alleges that minorities "ha[ve] enough political heft to exert significant influence on the choice of a candidate though not enough to determine that choice." *Barnett v. Chicago*, 141 F.3d 699, 703 (7th Cir. 1998). On the other hand, the plaintiffs' "coalition" claim alleges that minorities can, in fact, elect a candidate of their choice with the support of crossover voters from other racial or ethnic groups. *See Georgia v. Ashcroft*, 539 U.S. 461, 481-82 (distinguishing "influence" and "coalition" districts). Because the complaint does not raise an influence dilution claim, we do not consider the question here.

there is first defined a standard of reference as to what a vote should be worth." *Baker v. Carr*, 369 U.S. 186, 300 (1962) (Frankfurter, J., dissenting); *see also Gingles*, 478 U.S. at 88 (O'Connor, J., concurring) (noting that to evaluate a vote dilution claim, "it is . . . necessary to construct a measure of 'undiluted' minority voting strength.").

The size, compactness, and cohesiveness requirements of the *Gingles* preconditions are at the heart of the measure of undiluted voting strength that the Supreme Court has adopted for vote dilution claims. In *Gingles*, Justice O'Connor observed that the first and second preconditions establish a standard of undiluted minority voting strength in terms of the voting power a minority group could wield if its members were all concentrated within one, hypothetical single-member district.

> The Court's definition of the elements of a vote dilution claim is simple and invariable: a court should calculate minority voting strength by assuming that the minority group is concentrated in a single-member district in which it constitutes a voting majority. Where the minority group is not large enough, geographically concentrated enough, or politically cohesive enough for this to be possible, the minority group's claim fails. *Where the minority group meets these requirements, the representatives that it could elect in the hypothetical district or districts in which it constitutes a majority will serve as the measure of its undiluted voting strength.* Whatever plan the State actually adopts must be assessed in terms of the effect it has on this undiluted voting strength.

*Gingles*, 478 U.S. at 90-91 (O'Connor, J., concurring) (emphasis added). The electoral ability of a group concentrated within a hypothetical single-member district makes sense as the measure of *undiluted* minority voting strength, because: (1) voting strength is measured in terms of a group's "ability to elect" candidates; and (2) "a minority group that could constitute a majority in a single-member district ordinarily has the potential ability to elect representatives *without white support*," while "a minority that could not constitute such a majority does not." *Id.* at 89 n.1 (emphasis added).

Stated differently, minority voters have the potential to elect a candidate *on the strength of their own ballots* when they can form a majority of the voters in some single-member district. When the voting potential of a minority group that is large enough to form a majority in a district has been thwarted by the manipulation of district lines,[12] minorities may justly claim that their "ability to elect" candidates has been diluted in violation of Section 2. On the other hand, when minority voters, as a group, are too small or loosely distributed to form a majority in a single-member district, they have no ability to elect candidates of *their own* choice, but must instead rely on the support of other groups to elect candidates. Under these circumstances, minorities cannot claim that their voting strength—that is, the potential to independently decide the outcome of an election—has been diluted in violation of Section 2. As the Supreme Court observed in *Growe*, a minority group claiming vote dilution must establish that it "has the potential to elect a representative *of its own choice* in some single-member district." *Growe*, 507 U.S. at 40 (emphasis added). And "[u]nless minority voters possess the *potential* to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Gingles*, 478 U.S. at 50 n.17.

---

[12]The Supreme Court has observed that an impermissible dilution of minority voting strength can result from practices that spread a cohesive minority group across several legislative districts "so that it is a majority in none . . . ." *Voinovich*, 507 U.S. at 153. This practice is referred to as "cracking" a potential voting majority of racial minorities. *Vieth v. Jubelirer*, 124 S. Ct. 1769, 1781 n.7 (2004) ("'Cracking' involves the splitting of a group or party among several districts to deny that group or party a majority in any of those districts."). On the other hand, vote dilution can also occur through "packing," a term that describes the "concentration of blacks into districts where they constitute an excessive majority." *Voinovich*, 507 U.S. at 154 (internal quotations omitted). The plaintiffs' vote dilution claim alleges both dilution-by-cracking and dilution-by-packing. Specifically, the plaintiffs allege that the 2001 Redistricting Plan reduces minority voting strength in the Fourth District by fragmenting a cohesive population of black voters in the Fourth District across several legislative districts. In addition, the plaintiffs allege that the new plan dilutes minority voting strength in the Fourth District by removing black voters from that district and packing them into what was already a majority-minority Third District.

Ultimately, the right to "undiluted" voting strength in Section 2 is a guarantee of equal opportunity in voting, ensuring that a minority group is not denied, on account of race, color, or language minority status, the opportunity to exercise an electoral power that is commensurate with its population in the relevant jurisdiction. *See Smith v. Brunswick County*, 984 F.2d 1393, 1400 (4th Cir. 1993) (explaining that "the analysis [of a vote dilution claim] must consider whether the protected voting group has a voting opportunity that relates favorably to the group's population in the jurisdiction for which the election is being held."). This guarantee of equal opportunity in voting is evident in the plain language of Section 2, which is violated whenever an election law or practice leaves minorities with "less opportunity than other members of the electorate . . . to elect representatives of their choice." 42 U.S.C. § 1973(b); *see also Voinovich*, 507 U.S. at 155 ("Only if the apportionment scheme has the effect of denying a protected class the equal opportunity to elect its candidate of choice does it violate § 2; where such an effect has not been demonstrated, § 2 simply does not speak to the matter."). As a result, to establish a vote dilution claim under Section 2, minorities must prove that they have been unlawfully denied the political opportunity they would have enjoyed as a voting-age majority in a single-member district: namely, the opportunity to "dictate electoral outcomes independently" of other voters in the jurisdiction. *Voinovich*, 507 U.S. at 154.

B.

In light of these principles informing a vote dilution claim under Section 2, we must conclude that the complaint in this case fails to state a claim upon which relief can be granted. The plaintiffs cannot establish that black voters have been denied an equal opportunity to elect candidates of their choice. The 2001 Redistricting Plan reduces the voting-age population of blacks in the Fourth District from 37.8 to 32.3 percent. It does not follow, however, that the new plan dilutes minority voting strength under Section 2. Section 2 and *Gingles* instruct that a plan may not create a barrier to the ability of minorities to elect their preferred candidates. As a group that could only form a minority of the voters in the Fourth District even before the Plan's enactment, the ability to elect candidates of their own choice was never within the plaintiffs' grasp. *See Cano v. Davis*, 211 F. Supp. 2d 1208, 1231 (C.D. Cal. 2002) (observing that "unless the minority

group can establish that an effective majority-minority district can be created, a vote dilution claim is not cognizable because there is no minority voting power to dilute."), *aff'd*, 537 U.S. 1100 (2003). The plaintiffs concede that black voters cannot form a majority in the Fourth District, and thereby elect a candidate, without the support of voters from other racial or ethnic groups.

The argument that a coalition of black and white voters may claim that a redistricting plan dilutes their *combined* ability to elect candidates confuses the purpose of Section 2. The objective of Section 2 is not to ensure that a candidate supported by minority voters can be elected in a district. Rather, it is to guarantee that a minority group will not be denied, on account of race, color, or language minority status, the ability "to elect its candidate of choice on an equal basis with other voters." *Voinovich*, 507 U.S. at 153. Section 2 is not violated unless minorities "have less opportunity *than other members of the electorate* to . . . elect representatives of their choice." 42 U.S.C. § 1973(b) (emphasis supplied). As a result, the question facing the plaintiffs is not whether a black-preferred candidate can be elected in the Fourth District after the 2001 Redistricting Plan. The question is whether black voters have less opportunity, in comparison to other voters of similar strength in the jurisdiction, to form a majority in the Fourth District, and thereby elect a candidate of their choice. *See Gingles*, 478 U.S. at 44 ("The right question [in the Section 2 analysis] is whether as a result of the challenged practice or structure plaintiffs do not have an equal opportunity to participate in the political processes and to elect candidates of their choice.") (internal quotations omitted)). As the Sixth Circuit observed in *Nixon v. Kent County*, 76 F.3d 1381, 1392 (6th Cir. 1996), "the Voting Rights Act [is] aimed only at ensuring equal political opportunity: that every person's chance to form a majority is the same, regardless of race or ethnic origin."

At roughly 38 percent of the voting-age population in the Fourth District before the 2001 Redistricting Plan, blacks possessed the same opportunity to elect a candidate as any group that cannot form a majority of the voters in a district. A minority group that is too small to form a majority may be able to join with other voters to elect a candidate it supports. However, such groups will be obliged "to pull, haul, and trade to find common political ground" with other voters in

the district. *De Grandy*, 512 U.S. at 1020. The 2001 Redistricting Plan does not change this fact for black voters in the Fourth District; their political fortunes remain tied to the interests of other voters in the district. Because the same is true for all other groups in the Fourth District that are too small to dominate an election with their own votes, the plaintiffs cannot establish that black voters in the Fourth District have less opportunity "than other members of the electorate" to elect candidates of their choice. 42 U.S.C. § 1973(b); *see also Session v. Perry*, 298 F. Supp. 2d 451, 483 (E.D. Tex. 2004) ("A minority group lacking a majority cannot elect its candidate of choice, and denying the group a separate district cannot be a denial of any opportunity protected by the Act.").

Furthermore, any construction of Section 2 that authorizes the vote dilution claims of multiracial coalitions would transform the Voting Rights Act from a law that removes disadvantages based on race, into one that creates advantages for political coalitions that are not so defined. "Congress enacted § 2 of the Voting Rights Act . . . to help effectuate the Fifteenth Amendment's guarantee that no citizen's right to vote shall 'be denied or abridged . . . on account of race, color, or previous condition of servitude.'" *Voinovich*, 507 U.S. at 152 (quoting U.S. Const. amend. XV, § 1).

> The purpose of the [Voting Rights] Act is to redress racial or ethnic discrimination which manifests itself in voting patterns or electoral structures. . . . If a minority group lacks a common race or ethnicity, cohesion must rely principally on shared values, socio-economic factors, and coalition formation, making the group almost indistinguishable from political minorities as opposed to racial minorities.

*Campos v. City of Baytown*, 849 F.2d 943, 945 (5th Cir. 1988) (Higginbotham, J., dissenting from denial of reh'g en banc).

The essence of the plaintiffs' claim in this action is the assertion of a right to preserve their strength for the purposes of forging an advantageous political alliance. This is understandable, to be sure. However, we cannot find a basis for the protection of such a right in Section 2. The Voting Rights Act "is a balm for racial minorities, not political ones—even though the two often coincide." *Baird v. Consol.*

*City of Indianapolis*, 976 F.2d 357, 361 (1992). A redistricting plan that does not adversely affect a minority group's potential to form a majority in a district, but rather diminishes its ability to form a political coalition with other racial or ethnic groups, does not result in vote dilution "on account of race" in violation of Section 2.[13]

## IV.

Because the plaintiffs cannot establish that black voters in the Fourth District can form a majority in a single-member district as required by *Gingles*, the complaint fails to state a vote dilution claim under Section 2. Accordingly, the district court's order dismissing the complaint with prejudice is

*AFFIRMED.*

---

[13]The plaintiffs' reliance on *Georgia v. Ashcroft* fails for the same reason. The plaintiffs claim that the Supreme Court in *Georgia* retreated from the *Gingles* rule that a minority group can claim no right under Section 2 unless it can form a majority of the voters in a single-member district. In *Georgia*, the Supreme Court noted that "[t]here are communities in which minority citizens are able to form coalitions with voters from other racial and ethnic groups, having no need to be a majority within a single district in order to elect candidates of their choice." 539 U.S. at 481 (internal quotations omitted). We do not believe that this observation alters the *Gingles* numerical majority requirement in any way. A coalition of black and white voters can certainly join forces to elect a candidate, but Section 2 does not create an *entitlement* for minorities to form an alliance with other voters in a district who do not share the same statutory disability as the protected class.